43 U.S. 127 (____)
2 How. 127
FRANCOIS FENELON VIDAL, JOHN F. GIRARD, AND OTHERS, CITIZENS AND SUBJECTS OF THE MONARCHY OF FRANCE, AND HENRY STUMP, COMPLAINANTS AND APPELLANTS,
v.
THE MAYOR, ALDERMEN, AND CITIZENS OF PHILADELPHIA, THE EXECUTORS OF STEPHEN GIRARD, AND OTHERS, DEFENDANTS.
Supreme Court of United States.

*143 Jones and Webster, for the appellants, who were also the complainants below.
Binney and Sergeant, for the defendants.
*183 Mr. Justice STORY delivered the opinion of the court.
This cause has been argued with great learning and ability. Many topics have been discussed in the arguments, as illustrative of the principal grounds of controversy, with elaborate care, upon which, however, in the view which we have taken of the merits of the cause, it is not necessary for us to express any opinion, nor even to allude to their bearing or application. We shall, therefore, confine ourselves to the exposition of those questions and principles which, in our judgment, dispose of the whole matters in litigation; so far at least as they are proper for the final adjudication of the present suit.
The late Stephen Girard, by his will dated the 25th day of December, A.D. 1830, after making sundry bequests to his relatives and friends, to the city of New Orleans, and to certain specified charities, proceeded in the 20th clause of that will to make the following bequest, on which the present controversy mainly hinges. "XX. And whereas I have been for a long time impressed," &c. [See the statement prepared by the reporter.]
The testator then proceeded to give a minute detail of the plan and structure of the college, and certain rules and regulations for the due management and government thereof, and the studies to be pursued therein, "comprehending reading, writing, grammar, arithmetic, geography, navigation, surveying, practical mathematics, astronomy, natural, chemical, and experimental philosophy, the *184 French and Spanish languages," (not forbidding but not recommending the Greek and Latin languages,) "and such other learning and science as the capacities of the several scholars may merit or warrant." He then added, "I would have them taught facts and things rather than words or signs; and especially I desire that by every proper means a pure attachment to our republican institutions, and to the sacred rights of conscience as guarantied by our happy constitutions shall be formed and fostered in the minds of the scholars."
The persons who are to receive the benefits of the institution he declared to be, "poor white male orphans between the ages of six and ten years; and no orphan should be admitted until the guardians or directors of the poor, or other proper guardian, or other competent authority, have given by indenture, relinquishment or otherwise, adequate power to the mayor, aldermen, and citizens of Philadelphia, or to directors or others by them appointed, to enforce in relation to each orphan every proper restraint, and to prevent relatives or others from interfering with, or withdrawing such orphan from the institution." The testator then provided for a preference, "first, to orphans born in the city of Philadelphia; secondly, to those born in any other part of Pennsylvania; thirdly, to those born in the city of New York; and lastly, to those born in the city of New Orleans." The testator further provided that the orphan "scholars who shall merit it, shall remain in the college until they shall respectively arrive at between fourteen and eighteen years of age."
The testator then, after suggesting that in relation to the organization of the college and its appendages, he leaves necessarily many details to the mayor, aldermen, and citizens of Philadelphia, and their successors, proceeded to say: "there are, however, some restrictions which I consider it my duty to prescribe, and to be, amongst others, conditions on which my bequest for said college is made and to be enjoyed, namely: First, I enjoin and require," &c. [See statement of the reporter.] This second injunction and requirement is that which has been so elaborately commented on at the bar, as derogatory to the Christian religion, and upon which something will be hereafter suggested in the course of this opinion.
The testator then bequeathed the sum of $500,000 to be invested, and the income thereof applied to lay out, regulate, and light and pave a passage or street in the east part of the city of Philadelphia, fronting the river Delaware, not less than twenty-one feet wide and to be called Delaware Avenue, &c.; and to this intent to obtain such *185 acts of Assembly, and to make such purchases or agreements as will enable the mayor, aldermen, and citizens of Philadelphia to remove or pull down all the buildings, fences, and obstructions, which may be in the way, and to prohibit all buildings, fences, or erections of any kind to the eastward of said avenue, &c., &c.; and he proceeded to give other minute directions touching the same.
The testator then bequeathed to the commonwealth of Pennsylvania the sum of $300,000 for the purpose of internal improvement by canal navigation, to be paid into the state treasury as soon as such laws shall be enacted by the legislature to carry into effect the several improvements before specified, and certain other improvements.
The testator then bequeathed the remainder of the residue of his personal estate in trust to invest the same in good securities, &c., so that the whole shall form a permanent fund, and to apply the income thereof to certain specified purposes, which he proceeds to name; and then said: "To all which objects," &c. [See statement of the reporter.]
These are the material clauses of the will which seem necessary to be brought under our review in the present controversy. By a codicil dated the 20th of June, A.D. 1831, the testator made the following provision: "Whereas I, Stephen Girard, the testator named in the foregoing will and testament, dated February 16th, 1830, have since the execution thereof, purchased several parcels and pieces of land and real estate, and have built sundry messuages, all of which, as well as any real estate that I may hereafter purchase, it is my intention to pass by said will; and whereas, in particular, I have recently purchased from Mr. William Parker, the mansion-house, out-buildings, and forty-five acres and some perches of land, called Peel Hall, on the Ridge road, in Penn Township: Now, I declare it to be my intention, and I direct, that the orphan establishment, provided for in my said will, instead of being built as therein directed upon my square of ground between High and Chestnut and Eleventh and Twelfth streets, in the city of Philadelphia, shall be built upon the estate so purchased from Mr. W. Parker, and I hereby devote the said estate to that purpose, exclusively, in the same manner as I had devoted the said square, hereby directing that all the improvements and arrangements for the said orphan establishment, prescribed by my said will, as to said square, shall be made and executed upon the said estate, just as if I had in my will devoted the said estate to said purpose  consequently, the said square of ground is to constitute, *186 and I declare it to be a part of the residue and remainder of my real and personal estate, and given and devised for the same uses and purposes as are declared in section twenty of my will, it being my intention, that the said square of ground shall be built upon, and improved in such a manner as to secure a safe and permanent income for the purposes stated in said twentieth section." The testator died in the same year; and his will and codicil were duly admitted to probate on the 31st of December of the same year.
The legislature of Pennsylvania passed the requisite laws to carry into effect the will, so far as respected the bequests of the $500,000 for the Delaware Avenue and the $300,000 for internal improvement by canal navigation, according to the request of the testator.
The present bill is brought by the heirs at law of the testator, to have the devise of the residue and remainder of the real estate to the mayor, aldermen, and citizens of Philadelphia in trust as aforesaid to be declared void, for the want of capacity of the supposed devisees to take lands by devise, or if capable of taking generally by devise for their own use and benefit, for want of capacity to take such lands as devisees in trust; and because the objects of the charity for which the lands are so devised in trust are altogether vague, indefinite, and uncertain, and so no trust is created by the said will which is capable of being executed or of being cognisable at law or in equity, nor any trust-estate devised that can vest at law or in equity in any existing or possible cestui que trust; and therefore the bill insists that as the trust is void, there is a resulting trust thereof for the heirs at law of the testator; and the bill accordingly seeks a declaration to that effect and the relief consequent thereon, and for a discovery and account, and for other relief.
The principal questions, to which the arguments at the bar have been mainly addressed, are; First, whether the corporation of the city of Philadelphia is capable of taking the bequest of the real and personal estate for the erection and support of a college upon the trusts and for the uses designated in the will: Secondly, whether these uses are charitable uses valid in their nature and capable of being carried into effect consistently with the laws of Pennsylvania: Thirdly, if not, whether, being void, the fund falls into the residue of the testator's estate, and belongs to the corporation of the city, in virtue of the residuary clause in the will; or it belongs, as a resulting or implied trust to the heirs and next of kin of the testator.
As to the first question, so far as it respects the capacity of the *187 corporation to take the real and personal estate, independently of the trusts and uses connected therewith, there would not seem to be any reasonable ground for doubt. The act of 32 and 34 Henry 8, respecting wills, excepts corporations from taking by devise; but this provision has never been adopted into the laws of Pennsylvania or in force there. The act of 11th of March, 1789, incorporating the city of Philadelphia, expressly provides that the corporation, thereby constituted by the name and style of the Mayor, Aldermen, and Citizens of Philadelphia, shall have perpetual succession, "and they and their successors shall at all times for ever be capable in law to have, purchase, take, receive, possess, and enjoy lands, tenements and hereditaments, liberties, franchises and jurisdictions, goods, chattels, and effects to them and their successors for ever, or for any other or less estate," &c., without any limitation whatsoever as to the value or amount thereof, or as to the purposes to which the same were to be applied, except so far as may be gathered from the preamble of the act, which recites that the then administration of government within the city of Philadelphia was in its form "inadequate to the suppression of vice and immorality, to the advancement of the public health and order, and to the promotion of trade, industry, and happiness, and in order to provide against the evils occasioned thereby, it is necessary to invest the inhabitants thereof with more speedy, rigorous, and effective powers of government than at present established." Some, at least, of these objects might certainly be promoted by the application of the city property or its income to them  and especially the suppression of vice and immorality, and the promotion of trade, industry, and happiness. And if a devise of real estate had been made to the city directly for such objects, it would be difficult to perceive why such trusts should not be deemed within the true scope of the city charter and protected thereby.
But without doing more at present than merely to glance at this consideration, let us proceed to the inquiry whether the corporation of the city can take real and personal property in trust. Now, although it was in early times held that a corporation could not take and hold real or personal estate in trust upon the ground that there was a defect of one of the requisites to create a good trustee, viz., the want of confidence in the person; yet that doctrine has been long since exploded as unsound, and too artificial; and it is now held, that where the corporation has a legal capacity to take real or personal estate, there it may take and hold it upon trust, in the same *188 manner and to the same extent as a private person may do. It is true that, if the trust be repugnant to, or inconsistent with the proper purposes for which the corporation was created, that may furnish a ground why it may not be compellable to execute it. But that will furnish no ground to declare the trust itself void, if otherwise unexceptionable; but it will simply require a new trustee to be substituted by the proper court, possessing equity jurisdiction, to enforce and perfect the objects of the trust. This will be sufficiently obvious upon an examination of the authorities; but a single case may suffice. In Sonley v. The Clockmaker's Company, 1 Bro. Ch. R. 81, there was a devise of freehold estate to the testator's wife for life, with remainder to his brother C. in tail male, with remainder to the Clockmaker's Company, in trust to sell for the benefit of the testator's nephews and nieces. The devise being to a corporation, was, by the English statute of wills, void, that statute prohibiting devises to corporations, and the question was, whether the devise being so void, the heir at law took beneficially or subject to the trust. Mr. Baron Eyre, in his judgment, said, that although the devise to the corporation be void at law, yet the trust is sufficiently created to fasten itself upon any estate the law may raise. This is the ground upon which courts of equity have decreed, in cases where no trustee is named. Now, this was a case not of a charitable devise, but a trust created for nephews and nieces; so that it steers wide from the doctrines which have been established as to devises to corporations for charities as appointments under the statute of 43 Elizabeth: à fortiori, the doctrine of this case must apply with increased stringency to a case where the corporation is capable at law to take the estate devised, but the trusts are utterly dehors the purposes of the incorporation. In such a case, the trust itself being good, will be executed by and under the authority of a court of equity. Neither is there any positive objection in point of law to a corporation taking property upon a trust not strictly within the scope of the direct purposes of its institution, but collateral to them; nay, for the benefit of a stranger or of another corporation. In the case of Green v. Rutherforth, 1 Ves. R. 462, a devise was made to St. John's College in Cambridge of the perpetual advowson of a rectory in trust, that whenever the church should be void and his nephew be capable of being presented thereto, they should present him; and on the next avoidance should present one of his name and kindred, if there should be any one capable thereof in the college; if none such, they should present the *189 senior divine then fellow of the college, and on his refusal the next senior divine, and so downward; and, if all refused, they should present any other person they should think fit. Upon the argument of the cause, an objection was taken that the case was not cognisable in a court of equity, but fell within the jurisdiction of the visitor. Sir John Strange (the Master of the Rolls) who assisted Lord Hardwicke at the hearing of the cause, on that occasion said: "A private person would, undoubtedly, be compellable to execute it (the trust;) and, considered as a trust, it makes no difference who are the trustees, the power of this court operating on them in the capacity of trustees. And though they are a collegiate body whose founder has given a visitor to superintend his own foundation and bounty; yet as between one claiming under a separate benefactor and these trustees for special purposes, the court will look on them as trustees only, and oblige them to execute it under direction of the court." Lord Hardwicke, after expressing his concurrence in the judgment of the Master of the Rolls, put the case of the like trust being to present no member of another college, and held that the court would have jurisdiction to enforce it.
But if the purposes of the trust be germane to the objects of the incorporation; if they relate to matters which will promote, and aid, and perfect those objects; if they tend (as the charter of the city of Philadelphia expresses it) "to the suppression of vice and immorality, to the advancement of the public health and order, and to the promotion of trade, industry, and happiness," where is the law to be found which prohibits the corporation from taking the devise upon such trusts, in a state where the statutes of mortmain do not exist, (as they do not in Pennsylvania,) the corporation itself having a legal capacity to take the estate as well by devise as otherwise? We know of no authorities which inculcate such a doctrine or prohibit the execution of such trusts, even though the act of incorporation may have for its main objects mere civil and municipal government and regulations and powers. If, for example, the testator by his present will had devised certain estate of the value of $1,000,000 for the purpose of applying the income thereof to supplying the city of Philadelphia with good and wholesome water for the use of the citizens, from the river Schuylkill, (an object which some thirty or forty years ago would have been thought of transcendant benefit,) why, although not specifically enumerated among the objects of the charter, would not such a devise upon such a trust have been valid, *190 and within the scope of the legitimate purposes of the corporation, and the corporation capable of executing it as trustees? We profess ourselves unable to perceive any sound objection to the validity of such a trust; and we know of no authority to sustain any objection to it. Yet, in substance, the trust would be as remote from the express provisions of the charter as are the objects (supposing them otherwise maintainable) now under our consideration. In short, it appears to us that any attempt to narrow down the powers given to the corporation so as to exclude it from taking property upon trusts for purposes confessedly charitable and beneficial to the city or the public, would be to introduce a doctrine inconsistent with sound principles, and defeat instead of promoting the true policy of the state. We think, then, that the charter of the city does invest the corporation with powers and rights to take property upon trust for charitable purposes, which are not otherwise obnoxious to legal animadversion; and, therefore, the objection that it is incompetent to take or administer a trust is unfounded in principle or authority, under the law of Pennsylvania.
It is manifest that the legislature of Pennsylvania acted upon this interpretation of the charter of the city, in passing the acts of the 24th of March, and the 4th of April, 1832, to carry into effect certain improvements and execute certain trusts, under the will of Mr. Girard. The preamble to the trust act, expressly states that it is passed "to effect the improvements contemplated by the said testator, and to execute, in all other respects, the trusts created by his will," as to which, the testator had desired the legislature to pass the necessary laws. The tenth section of the same act, provides "That it shall be lawful for the mayor, aldermen, and citizens of Philadelphia, to exercise all such jurisdiction, enact all such ordinances, and to do and execute all such acts and things whatsoever, as may be necessary and convenient for the full and entire acceptance, execution, and prosecution of any and all the devises, bequests, trusts, and provisions contained in the said will, &c., &c.; to carry which into effect," the testator had desired the legislature to enact the necessary laws. But what is more direct to the present purpose, because it imports a full recognition of the validity of the devise for the erection of the college, is the provision of the 11th section of the same act, which declares "That no road or street shall be laid out, or passed through the land in the county of Philadelphia, bequeathed by the late Stephen Girard for the erection of a college, unless the same shall be recommended by *191 the trustees or directors of the said college, and approved by a majority of the select and common councils of the city of Philadelphia." The other act is also full and direct to the same purpose, and provides "That the select and common councils of the city of Philadelphia, shall be and they are hereby authorized to provide, by ordinance or otherwise, for the election or appointment of such officers and agents as they may deem essential to the due execution of the duties and trusts enjoined and created by the will of the late Stephen Girard." Here then, there is a positive authority conferred upon the city authorities to act upon the trusts under the will, and to administer the same through the instrumentality of agents appointed by them. No doubt can then be entertained, that the legislature meant to affirm the entire validity of those trusts, and the entire competency of the corporation to take and hold the property devised upon the trusts named in the will.
It is true that this is not a judicial decision, and entitled to full weight and confidence as such. But it is a legislative exposition and confirmation of the competency of the corporation to take the property and execute the trusts; and if those trusts were valid in point of law, the legislature would be estopped thereafter to contest the competency of the corporation to take the property and execute the trusts, either upon a quo warranto or any other proceeding, by which it should seek to devest the property, and invest other trustees with the execution of the trusts, upon the ground of any supposed incompetency of the corporation. And if the trusts were in themselves valid in point of law, it is plain that neither the heirs of the testator, nor any other private persons, could have any right to inquire into, or contest the right of the corporation to take the property, or to execute the trusts; but this right would exclusively belong to the state in its sovereign capacity, and in its sole discretion, to inquire into and contest the same by a quo warranto, or other proper judicial proceeding. In this view of the matter, the recognition and confirmation of the devises and trusts of the will by the legislature, are of the highest importance and potency.
We are, then, led directly to the consideration of the question which has been so elaborately argued at the bar, as to the validity of the trusts for the erection of the college, according to the requirements and regulations of the will of the testator. That the trusts are of an eleemosynary nature, and charitable uses in a judicial sense, we entertain no doubt. Not only are charities for the maintenance *192 and relief of the poor, sick, and impotent, charities in the sense of the common law, but also donations given for the establishment of colleges, schools, and seminaries of learning, and especially such as are for the education of orphans and poor scholars.
The statute of the 43 of Elizabeth, ch. 4, has been adjudged by the Supreme Court of Pennsylvania not to be in force in that state. But then it has been solemnly and recently adjudged by the same court, in the case of Zimmerman v. Andres, (January term, 1844,) that "it is so considered rather on account of the inapplicability of its regulations as to the modes of proceeding, than in reference to its conservative provisions." "These have been in force here by common usage and constitutional recognition; and not only these, but the more extensive range of charitable uses which chancery supported before that statute and beyond it." Nor is this any new doctrine in that court; for it was formally promulgated in the case of Witman v. Lex, 17 Serg. and Rawle, 88, at a much earlier period, (1827.)
Several objections have been taken to the present bequest to extract it from the reach of these decisions. In the first place, that the corporation of the city is incapable by law of taking the donation for such trusts. This objection has been already sufficiently considered. In the next place, it is said, that the beneficiaries who are to receive the benefit of the charity are too uncertain and indefinite to allow the bequest to have any legal effect, and hence the donation is void, and the property results to the heirs. And in support of this argument we are pressed by the argument that charities of such an indefinite nature are not good at the common law, (which is admitted on all sides to be the law of Pennsylvania, so far as it is applicable to its institutions and constitutional organization and civil rights and privileges) and hence the charity fails; and the decision of this court in the case of the trustees of the Philadelphia Baptist Association v. Hart's Executors, 4 Wheat. R. 1, is strongly relied on as fully in point. There are two circumstances which materially distinguish that case from the one now before the court. The first is, that that case arose under the law of Virginia, in which state the statute of 43 Elizabeth, ch. 4, had been expressly and entirely abolished by the legislature, so that no aid whatsoever could be derived from its provisions to sustain the bequest. The second is, that the donees (the trustees) were an unincorporated association, which had no legal capacity to take and hold the donation in succession for the purposes of the trust, and the beneficiaries also were uncertain and indefinite. *193 Both circumstances, therefore, concurred; a donation to trustees incapable of taking, and beneficiaries uncertain and indefinite. The court, upon that occasion, went into an elaborate examination of the doctrine of the common law on the subject of charities, antecedent to and independent of the statute of 43 Elizabeth, ch. 4, for that was still the common law of Virginia. Upon a thorough examination of all the authorities and all the lights, (certainly in no small degree shadowy, obscure, and flickering,) the court came to the conclusion that, at the common law, no donation to charity could be enforced in chancery, where both of these circumstances, or rather, where both of these defects occurred. The court said: "We find no dictum that charities could be established on such an information (by the attorney-general) where the conveyance was defective or the donation was so vaguely expressed that the donee, if not a charity, would be incapable of taking." In reviewing the authorities upon that occasion, much reliance was placed upon Collison's case, Hobart's Rep. 136; (S.C. cited Duke on Charities, by Bridgman, 368, Moore, R. 888,) and Platt v. St. John's College, Cambridge, Finch. Rep. 221; (S.C. 1 Cas. in Chan. R. 267, Duke on Charities, by Bridgman, 379,) and the case reported in 1 Chancery Cases, 134. But these cases, as also Flood's case, Hob. R. 136, (S.C. 1 Equity Abridg. 95, pl. 6,) turned upon peculiar circumstances. Collison's case was upon a devise in 15 Henry 8, and was before the statute of wills. The other cases were cases where the donees could not take at law, not being properly described, or not having a competent capacity to take, so that there was no legal trustee; and yet the devises were held good as valid appointments under the statute of 43 Elizabeth. The dictum of Lord Loughborough in Attorney-General v. Bowyer, 3 Ves. 714, 726, was greatly relied on, where he says: "It does not appear that this court at that period (that is before the statute of wills) had cognisance upon information for the establishment of charities. Prior to the time of Lord Ellesmere, as far as tradition in times immediately following goes, there were no such informations as this on which I am now sitting, (an information to establish a college under a devise before the statute of mortmain of 9 Geo. 2, ch. 36;) but they made out their case as well as they could at law." In this suggestion Lord Loughborough had under his consideration Porter's case, 1 Co. Rep. 16. But there a devise was made in 32 Henry 8, to the testator's wife, upon condition for her to grant the lands, &c., in all convenient speed after his decease *194 for the maintenance and continuance of a certain free-school, and almsmen and almswomen for ever. The heir entered for and after condition broken, and then conveyed the same lands to Queen Elizabeth in 34 of her reign; and the queen brought an information of intrusion against Porter for the land in the same year. One question was, whether the devise was not to a superstitious use, and therefore void under the act of 23 Henry 8, ch. 2, or whether it was good as a charitable use. And it was resolved by the court that the use was a good charitable use, and that the statute did not extend to it. So that here we have a plain case of a charity held good, before the statute of Elizabeth, upon the ground of the common law, there being a good devisee originally, although the condition was broken and the use was for charitable purposes in some respects indefinite. Now if there was a good devisee to take as trustee, and the charity was good at the common law, it seems somewhat difficult to say, why, if no legal remedy was adequate to redress it, the Court of Chancery might not enforce the trust, since trusts for other specific purposes, were then, at least when there were designated trustees, within the jurisdiction of chancery.
There are, however, dicta of eminent judges, (some of which were commented upon in the case of 4 Wheat. R. 1,) which do certainly support the doctrine that charitable uses might be enforced in chancery upon the general jurisdiction of the court, independently of the statute of 43 of Elizabeth; and that the jurisdiction had been acted upon not only subsequent but antecedent to that statute. Such was the opinion of Sir Joseph Jekyll in Eyre v. Countess of Shaftsbury, (2 P. Will. R. 102, 2 Equity Abridg. 710, pl. 2,) and that of Lord Northington in Attorney-General v. Tancred, 1 Eden, R. 10, (S.C. Ambler, R. 351, 1 Wm. Black. R. 90,) and that of Lord Chief Justice Wilmot in his elaborate judgment in Attorney-General v. Lady Downing, Wilmot's Notes, p. 1, 26, given after an examination of all the leading authorities. Lord Eldon, in the Attorney-General v. The Skinner's Company, 2 Russ. R. 407, intimates in clear terms his doubts whether the jurisdiction of chancery over charities arose solely under the statute of Elizabeth; suggesting that the statute has perhaps been construed with reference to a supposed antecedent jurisdiction of the court, by which void devises to charitable purposes were sustained. Sir John Leach, in the case of a charitable use before the statute of Elizabeth, (Attorney-General v. The Master of Brentwood School, 1 Mylne and Keen, 376,) said: "Although at *195 his time no legal devise could be made to a corporation for a charitable use, yet lands so devised were in equity bound by a trust for the charity, which a court of equity would then execute." In point of fact the charity was so decreed in that very case, in the 12th year of Elizabeth. But what is still more important is the declaration of Lord Redesdale, a great judge in equity, in the Attorney-General v. The Mayor of Dublin, 1 Bligh R. 312, 347, (1827,) where he says: "We are referred to the statute of Elizabeth with respect to charitable uses, as creating a new law upon the subject of charitable uses. That statute only created a new jurisdiction; it created no new law. It created a new and ancillary jurisdiction, a jurisdiction created by commission, &c.; but the proceedings of that commission were made subject to appeal to the Lord Chancellor, and he might reverse or affirm what they had done, or make such order as he might think fit for reserving the controlling jurisdiction of the Court of Chancery as it existed before the passing of that statute; and there can be no doubt that by information by the attorney-general the same thing might be done." He then adds, "the right which the attorney-general has to file an information, is a right of prerogative. The king, as parens patriæ, has a right, by his proper officer, to call upon the several courts of justice, according to the nature of their several jurisdictions, to see that right is done to his subjects who are incompetent to act for themselves, as in the case of charities and other cases." So that Lord Redesdale maintains the jurisdiction in the broadest terms, as founded in the inherent jurisdiction of chancery independently of the statute of 43 Elizabeth. In addition to these dicta and doctrines, there is the very recent case of the Incorporated Society v. Richards, 1 Drury and Warren R. 258, where Lord Chancellor Sugden, in a very masterly judgment, upon a full survey of all the authorities, and where the point was directly before him, held the same doctrine as Lord Redesdale, and expressly decided that there is an inherent jurisdiction in equity in cases of charity, and that charity is one of those objects for which a court of equity has at all times interfered to make good that, which at law was an illegal or informal gift; and that cases of charity in courts of equity in England were valid independently of and previous to the statute of Elizabeth.
Mr. Justice Baldwin, in the case of the will of Sarah Zane, which was cited at the bar and pronounced at April term of the Circuit Court, in 1833, after very extensive and learned researches into the ancient English authorities and statutes, arrived at the same conclusion *196 in which the district judge, the late lamented Judge Hopkinson, concurred; and that opinion has a more pointed bearing upon the present case, since it included a full review of the Pennsylvania laws and doctrines on the subject of charities.
But very strong additional light has been thrown upon this subject by the recent publications of the Commissioners on the public Records in England, which contain a very curious and interesting collection of the chancery records in the reign of Queen Elizabeth, and in the earlier reigns. Among these are found many cases in which the Court of Chancery entertained jurisdiction over charities long before the statute of 43 Elizabeth; and some fifty of these cases, extracted from the printed calendars, have been laid before us. They establish in the most satisfactory and conclusive manner that cases of charities where there were trustees appointed for general and indefinite charities, as well as for specific charities, were familiarly known to, and acted upon, and enforced in the Court of Chancery. In some of these cases the charities were not only of an uncertain and indefinite nature, but, as far as we can gather from the imperfect statement in the printed records, they were also cases where there were either no trustees appointed, or the trustees were not competent to take. These records, therefore, do in a remarkable manner, confirm the opinions of Sir Joseph Jekyll, Lord Northington, Lord Chief Justice Wilmot, Lord Redesdale, and Lord Chancellor Sugden. Whatever doubts, therefore, might properly be entertained upon the subject when the case of the Trustees of the Philadelphia Baptist Association v. Hart's Executors, 4 Wheat. 1, was before this court, (1819,) those doubts are entirely removed by the late and more satisfactory sources of information to which we have alluded.
If, then, this be the true state of the common law on the subject of charities, it would, upon the general principle already suggested, be a part of the common law of Pennsylvania. It would be no answer to say, that if so it was dormant, and that no court possessing equity powers now exists, or has existed in Pennsylvania, capable of enforcing such trusts. The trusts would nevertheless be valid in point of law; and remedies may from time to time be applied by the legislature to supply the defects. It is no proof of the non-existence of equitable rights, that there exists no adequate legal remedy to enforce them. They may during the time slumber, but they are not dead.
But the very point of the positive existence of the law of charities in Pennsylvania, has been (as already stated) fully recognised and *197 enforced in the state courts of Pennsylvania, as far as their remedial process would enable these courts to act. This is abundantly established in the cases cited at the bar, and especially by the case of Witman v. Lex, 17 Serg. and Rawle, 88, and that of Sarah Zane's will, before Mr. Justice Baldwin and Judge Hopkinson. In the former case, the court said "that it is immaterial whether the person to take be in esse or not, or whether the legatee were at the time of the bequest a corporation capable of taking or not, or how uncertain the objects may be, provided there be a discretionary power vested anywhere over the application of the testator's bounty to those objects; or whether their corporate designation be mistaken. If the intention sufficiently appears in the bequest, it would be valid." In the latter case certain bequests given by the will of Mrs. Zane to the Yearly Meeting of Friends in Philadelphia, an unincorporated association, for purposes of general and indefinite charity, were, as well as other bequests of a kindred nature, held to be good and valid; and were enforced accordingly. The case then, according to our judgment, is completely closed in by the principles and authorities already mentioned, and is that of a valid charity in Pennsylvania, unless it is rendered void by the remaining objection which has been taken to it.
This objection is that the foundation of the college upon the principles and exclusions prescribed by the testator, is derogatory and hostile to the Christian religion, and so is void, as being against the common law and public policy of Pennsylvania; and this for two reasons: First, because of the exclusion of all ecclesiastics, missionaries, and ministers of any sect from holding or exercising any station or duty in the college, or even visiting the same: and Secondly, because it limits the instruction to be given to the scholars to pure morality, and general benevolence, and a love of truth, sobriety, and industry, thereby excluding, by implication, all instruction in the Christian religion.
In considering this objection, the court are not at liberty to travel out of the record in order to ascertain what were the private religious opinions of the testator, (of which indeed we can know nothing,) nor to consider whether the scheme of education by him prescribed, is such as we ourselves should approve, or as is best adapted to accomplish the great aims and ends of education. Nor are we at liberty to look at general considerations of the supposed public interests and policy of Pennsylvania upon this subject, beyond what its constitution and laws and judicial decisions make known to us. The question, what *198 is the public policy of a state, and what is contrary to it, if inquired into beyond these limits, will be found to be one of great vagueness and uncertainty, and to involve discussions which scarcely come within the range of judicial duty and functions, and upon which men may and will complexionally differ; above all, when that topic is connected with religious polity, in a country composed of such a variety of religious sects as our country, it is impossible not to feel that it would be attended with almost insuperable difficulties, and involve differences of opinion almost endless in their variety. We disclaim any right to enter upon such examinations, beyond what the state constitutions, and laws, and decisions necessarily bring before us.
It is also said, and truly, that the Christian religion is a part of the common law of Pennsylvania. But this proposition is to be received with its appropriate qualifications, and in connection with the bill of rights of that state, as found in its constitution of government. The constitution of 1790, (and the like provision will, in substance, be found in the constitution of 1776, and in the existing constitution of 1838,) expressly declares, "That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect, or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience; and no preference shall ever be given by law to any religious establishments or modes of worship." Language more comprehensive for the complete protection of every variety of religious opinion could scarcely be used; and it must have been intended to extend equally to all sects, whether they believed in Christianity or not, and whether they were Jews or infidels. So that we are compelled to admit that although Christianity be a part of the common law of the state, yet it is so in this qualified sense, that its divine origin and truth are admitted, and therefore it is not to be maliciously and openly reviled and blasphemed against, to the annoyance of believers or the injury of the public. Such was the doctrine of the Supreme Court of Pennsylvania in Updegraff v. The Commonwealth, 11 Serg. and Rawle, 394.
It is unnecessary for us, however, to consider what would be the legal effect of a devise in Pennsylvania for the establishment of a school or college, for the propagation of Judaism, or Deism, or any other form of infidelity. Such a case is not to be presumed to exist in a Christian country; and therefore it must be made out by clear *199 and indisputable proof. Remote inferences, or possible results, or speculative tendencies, are not to be drawn or adopted for such purposes. There must be plain, positive, and express provisions, demonstrating not only that Christianity is not to be taught; but that it is to be impugned or repudiated.
Now, in the present case, there is no pretence to say that any such positive or express provisions exist, or are even shadowed forth in the will. The testator does not say that Christianity shall not be taught in the college. But only that no ecclesiastic of any sect shall hold or exercise any station or duty in the college. Suppose, instead of this, he had said that no person but a layman shall be an instructor or officer or visitor in the college, what legal objection could have been made to such a restriction? And yet the actual prohibition is in effect the same in substance. But it is asked; why are ecclesiastics excluded, if it is not because they are the stated and appropriate preachers of Christianity? The answer may be given in the very words of the testator. "In making this restriction," says he, "I do not mean to cast any reflection upon any sect or person whatsoever. But as there is such a multitude of sects and such a diversity of opinion amongst them, I desire to keep the tender minds of the orphans, who are to derive advantage from this bequest, free from the excitement which clashing doctrines and sectarian controversy are so apt to produce." Here, then, we have the reason given; and the question is not, whether it is satisfactory to us or not; nor whether the history of religion does or does not justify such a sweeping statement; but the question is, whether the exclusion be not such as the testator had a right, consistently with the laws of Pennsylvania, to maintain, upon his own notions of religious instruction. Suppose the testator had excluded all religious instructors but Catholics, or Quakers, or Swedenborgians; or, to put a stronger case, he had excluded all religious instructors but Jews, would the bequest have been void on that account? Suppose he had excluded all lawyers, or all physicians, or all merchants from being instructors or visitors, would the prohibition have been fatal to the bequest? The truth is, that in cases of this sort, it is extremely difficult to draw any just and satisfactory line of distinction in a free country as to the qualifications or disqualifications which may be insisted upon by the donor of a charity as to those who shall administer or partake of his bounty.
But the objection itself assumes the proposition that Christianity *200 is not to be taught, because ecclesiastics are not to be instructors or officers. But this is by no means a necessary or legitimate inference from the premises. Why may not laymen instruct in the general principles of Christianity as well as ecclesiastics. There is no restriction as to the religious opinions of the instructors and officers. They may be, and doubtless, under the auspices of the city government, they will always be, men, not only distinguished for learning and talent, but for piety and elevated virtue, and holy lives and characters. And we cannot overlook the blessings, which such men by their conduct, as well as their instructions, may, nay must impart to their youthful pupils. Why may not the Bible, and especially the New Testament, without note or comment, be read and taught as a divine revelation in the college  its general precepts expounded, its evidences explained, and its glorious principles of morality inculcated? What is there to prevent a work, not sectarian, upon the general evidences of Christianity, from being read and taught in the college by lay-teachers? Certainly there is nothing in the will, that proscribes such studies. Above all, the testator positively enjoins, "that all the instructors and teachers in the college shall take pains to instil into the minds of the scholars the purest principles of morality, so that on their entrance into active life they may from inclination and habit evince benevolence towards their fellow-creatures, and a love of truth, sobriety, and industry, adopting at the same time such religious tenets as their matured reason may enable them to prefer." Now, it may well be asked, what is there in all this, which is positively enjoined, inconsistent with the spirit or truths of Christianity? Are not these truths all taught by Christianity, although it teaches much more? Where can the purest principles of morality be learned so clearly or so perfectly as from the New Testament? Where are benevolence, the love of truth, sobriety, and industry, so powerfully and irresistibly inculcated as in the sacred volume? The testator has not said how these great principles are to be taught, or by whom, except it be by laymen, nor what books are to be used to explain or enforce them. All that we can gather from his language is, that he desired to exclude sectarians and sectarianism from the college, leaving the instructors and officers free to teach the purest morality, the love of truth, sobriety, and industry, by all appropriate means; and of course including the best, the surest, and the most impressive. The objection, then, in this view, goes to this,  either that the testator has totally omitted to provide for religious instruction in his *201 scheme of education, (which, from what has been already said, is an inadmissible interpretation,) or that it includes but partial and imperfect instruction in those truths. In either view can it be truly said that it contravenes the known law of Pennsylvania upon the subject of charities, or is not allowable under the article of the bill of rights already cited? Is an omission to provide for instruction in Christianity in any scheme of school or college education a fatal defect, which avoids it according to the law of Pennsylvania? If the instruction provided for is incomplete and imperfect, is it equally fatal? These questions are propounded, because we are not aware that any thing exists in the constitution or laws of Pennsylvania, or the judicial decisions of its tribunals, which would justify us in pronouncing that such defects would be so fatal. Let us take the case of a charitable donation to teach poor orphans reading, writing, arithmetic, geography, and navigation, and excluding all other studies and instruction; would the donation be void, as a charity in Pennsylvania, as being deemed derogatory to Christianity? Hitherto it has been supposed, that a charity for the instruction of the poor might be good and valid in England even if it did not go beyond the establishment of a grammar-school. And in America, it has been thought, in the absence of any express legal prohibitions, that the donor might select the studies, as well as the classes of persons, who were to receive his bounty without being compellable to make religious instruction a necessary part of those studies. It has hitherto been thought sufficient, if he does not require any thing to be taught inconsistent with Christianity.
Looking to the objection therefore in a mere juridical view, which is the only one in which we are at liberty to consider it, we are satisfied that there is nothing in the devise establishing the college, or in the regulations and restrictions contained therein, which are inconsistent with the Christian religion, or are opposed to any known policy of the state of Pennsylvania.
This view of the whole matter renders it unnecessary for us to examine the other and remaining question, to whom, if the devise were void, the property would belong, whether it would fall into the residue of the estate devised to the city, or become a resulting trust for the heirs at law.
Upon the whole, it is the unanimous opinion of the court, that the decree of the Circuit Court of Pennsylvania dismissing the bill, ought to be affirmed, and it is accordingly affirmed with costs.

*202 ORDER.
This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the eastern district of Pennsylvania, and was argued by counsel. On consideration whereof, It is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court, in this cause be, and the same is hereby affirmed with costs.