## Richmond.

### Board of Handley Trustees v. Winchester Memorial Hospital and Others.

#### November 17, 1910.

1. Municipal Corporations—*Administration of Trust—Substitution of Trustees by Legislature—Case in Judgment.*—The legislature may, in the absence of constitutional restriction on its powers, divest a municipal corporation of the power to administer through its common council a charitable trust conferred upon it, and appoint or provide for the appointment of new trustees independent of the corporation, and vest in them the management of such trusts. In the case in judgment this has been done at the instance of the council of the city, and the latter can no longer contract a debt against the trust funds. Under the terms of the act of assembly providing for their appointment (Acts 1895-'6, p. 298) the trustees have the power to control the fund and to protect it from the demands of the governing body of the city. The council of the city have only the power to supervise a plan for the ultimate disposition of the funds, to elect the trustees and to require of them annual reports, but it has no power, trust, control or right of any description over the trust funds themselves. The city has the same interest as before, but a new agency has been substituted for its management and control.

Appeal from a decree of the Circuit Court of the city of Alexandria. Decree for complainant. Defendant appeals.

*Reversed.*

The opinion states the case.

*Holmes Conrad* and *R. E. Byrd,* for the appellant.

*John M. Johnson,* for the appellees.

CARDWELL J., delivered the opinion of the court.

On the 13th day of February, 1895, Judge John Handley, a citizen of the city of Scranton, Pennsylvania, died, and by his will he made the following bequests to the city of Winchester, Va.:

"(4). Item. I give, and bequeath, to the city of Winchester, Frederick county, State of Virginia, the sum of two hundred and fifty thousand dollars, to be held in trust by said city of Winchester for the purposes hereinafter named. Said bequest is to be retained by said city, and invested in the bonds of the State of Virginia, at interest, until the said sum of money, and interest added, shall amount to five hundred thousand dollars. At which period of time I order and direct the said city of Winchester, to erect, construct, finish and open, a public library for the free use, of the people of the city of Winchester, forever thereafter. Said library shall be known and called, 'The Handley Library.'

"(5). Item. I further order and direct, that the city of Winchester, shall not expend or lay out, more than two hundred and fifty thousand dollars, of the said bequest, for the land and the library building erected thereon. Nor shall the said city of Winchester expend, or lay out, more than the net income of the balance or remainder of said bequests for maintaining the said library annually, and for the purchase of books, maps, works of art, &c., from time to time.

"(27). Item. All the rest and residue of my estate I give, devise and bequeath to the city of Winchester, Virginia, to be accumulated by said city for the period of twenty years. The income arising from said residue estate to be expended and laid out in said city by the erection of school houses for the education of the poor."

These provisions of Judge Handley's will having been communicated to the common council and the citizens of Winchester, it was the opinion of many that the city was not

only incompetent to administer the trusts created by the will, but that it was inexpedient that so great a fund, amounting to about a million of dollars, should become subject to political influences, and that the common council of the city, meeting but one a month and with multitudinous duties, could not, even under the best conditions, give the administration of the trust careful and intelligent attention. Recognizing the force of these views, shared by the common council and its legal adviser, Hon. R. M. Ward, as well as by a number of other leading citizens, the then mayor of the city, T. N. Lupton, as early as December 3, 1895, recommended to the common council the adoption of a resolution looking to the creation by the legislature of a board of trustees to administer the said trusts, designed to be carefully guarded and administered, which resolution, after discussion in the council, was adopted. The preamble to this resolution set forth, that "Whereas by the will of the late Judge Handley large sums of money have been bequeathed to the city of Winchester, and whereas we are advised that the city cannot in its corporate capacity administer a bequest;" and the resolution itself was as follows:

"Resolved, that we hereby request the General Assembly of Virginia to confirm and make self-perpetuating the following board of trustees, to receive and administer said bequest, and to that end to take all such steps as may be necessary to care for the interests of the city of Winchester in the premises. And the mayor of Winchester is hereby authorized and empowered on behalf of the city of Winchester to petition the General Assembly in accordance with this resolution. Said petition to be duly authenticated by the seal of the city and embodying an authenticated copy of this resolution."

At the same meeting of the common council certain citizens of Winchester were recommended for this board of trustees, and at a subsequent meeting held January 7, 1898, the council, through its president, appointed a committee of two persons

to prepare a petition or memorial to the legislature setting forth the purposes and desires of the council touching the Handley trust funds, which committee prepared a bill for enactment by the legislature, and reported the same to the council at a meeting held January 9, 1896, when the bill was considered carefully by the council and approved. At the same meeting of the council the following resolution was adopted: "That our representatives (in the legislature) be and they are hereby requested to urge the immediate passage of the bill relative to the (Handley) Board of Trustees as approved by the council."

At a meeting of the council held on January 20, 1896, certain members were chosen to appear before the legislature in session at Richmond and urge the passage of the aforesaid bill, and on the 7th day of February, 1896, the bill was enacted and became a law, the title thereof being: "An act to enable the city of Winchester to accept the bequests of John Handley, deceased, to validate the same, and provide for the administration thereof." Acts of 1895-6, p. 298. The first section of the act validated the bequests made in the Handley will, authorized the city to accept the same, and provided for the administration thereof; and the second section provided for the election by the common council of the city of a board of trustees, prescribing their qualifications and for filling vacancies on the board, and says: "The duties of the board shall be to carry out the objects of the benefactions of the will of the late John Handley, so far as they relate to the city of Winchester, and superintend and direct the custody and investment of the fund arising under the said will for these purposes, but no plan for the ultimate application of said fund in whole or in part for the purposes of said will shall be valid until the same has been reported to and approved by the common council of the city of Winchester, as hereinafter provided, * * * * The said trustees shall annually, and at such other times as the council may require, or the trustees

may see proper to do so, report to the common council of said city their proceedings for its information."

Upon the passage of the act of February 7, 1896, the city council elected a board of trustees, as the act authorized, and in the process of time the personel of the government of the city of Winchester changed; Mr. Ward remained city solicitor, but Hon. R. T. Barton became mayor instead of Mr. Lupton, and there were changes in the membership of the council. Then began a controversy as to whether the common council of the city or the Handley Board of Trustees had the keeping, custody and control of the funds bequeathed to the city in the will of Judge Handley. On August 18, 1900, the council, through the mayor of the city, its solicitor and another, addressed a communication to the Handley Board of Trustees, claiming that, "The legacy of Judge Handley being to the city of Winchester, absolute control of it for the objects specified in the will is vested in the common council, except in so far as it was plainly transferred to the board of trustees by the act of February 7, 1896;" and again, "It is equally clear to us that upon the report by the board of a plan for the ultimate disposition of the fund, the functions of the board will cease except so far as the existence of the board shall be continued by the provisions of the plan which may be so reported and adopted."

This contention on the part of the city council raised an issue which, of course, had to be met and determined once for all; whereupon Albert Baker and others, composing the Handley Board of Trustees, filed a bill in equity in the Circuit Court of Frederick county, making the city of Winchester party defendant, asking a construction of the act of February 7, 1896, *supra*, and for a judicial determination of the respective rights, duties and powers, in respect to the Handley funds, of the Handley Board of Trustees on the one hand and the common council of the city on the other. This bill, after reciting the origin of the controversy, and stating the

issue presented for determination, prayed, "that the exact limitations of the powers of your orators (Handley Board of Trustees) may. be ascertained and defined by decree of your honor's court."

At that time the Handley Board of Trustees had not been incorporated, but this was done by an act of the legislature at its session of 1904, and the plaintiffs in the bill were all the individual members of the board, suing as trustees. The defendant, city of Winchester, filed three pleas to said bill, signed and sworn to by R. M. Ward, city solicitor, and R. T. Barton, mayor, the first of which raised the question as to the right of the plaintiffs to maintain the suit; the second, after reciting the will of John Handley, averred the power, as well as the right, as a municipal corporation, to receive and accept the legacies and administer the trusts in favor of the city created by the will; that the Handley Board of Trustees was created under the charter power of the city only for the more effectual administration of the said trusts, that is, to enable the city, as trustee, through the board, to administer the said trusts, and that, therefore, the said trusts were in the city alone, and the plaintiffs had no standing in court. Plea No. 3 included the first and second pleas, and added an opinion of the Circuit Court of Appeals of Pennsylvania in the cause of *Handley's Heirs* v. *Handley's Executors*, claiming it to be an adjudication by that court that the city of Winchester was legatee and trustee under Handley's will, and that, therefore, the plaintiffs were not trustees, but merely "parts of the governmental machinery of the city of Winchester."

These pleas were held by the circuit court to be wholly bad in "form and substance," and they were rejected, the written opinion of the learned judge presiding made a part of the record, among other things, saying:

"It was doubted in some quarters whether the city could act as trustee of such a trust.

"It is not every trust that a municipal corporation can administer, such as trusts of purely private nature; but, however that might be, it was decided that the usual agencies of the corporation were inadequate for the purpose, and upon the petition of the common council, the legislature, by the act of February 7, 1896, provided for the board of trustees. who were charged with the duty of administering the trust. The common council of the city is the agent of the city, and the mouthpiece of the city in regard to all matters confided to it by law, but it is not the agent or the mouthpiece of the people of the city in regard to matters which are not confided to it.

"It seems to me that clearly, in regard to the control, custody and investment of this fund, and its application to the purposes of this trust, except so far as the approval of the ultimate plan of its application, the said statute removed the common council from having any agency in the premises and substituted the board of trustees.

"This board is the agent of the city and its people, and its mouthpiece in all matters pertaining to this trust. It is not that the city has abandoned anything, but that it has substituted a new agency which shall represent it, and which shall represent the people, and which shall speak for it in lieu of the common council, which but for the statute would have been the mouthpiece of the corporation."

This decision, rendered on the 5th day of February, 1901, was not appealed from, but stands as a final adjudication upon the issues made by the pleadings in the cause, and all along, in the subsequent litigation between the same parties, the board of trustees have contended that this adjudication was a final determination of the question of the relative rights, duties and powers of the common council of the city of Winchester and the Handley Board of Trustees, in reference to the custody, management, control and administration of the Handley fund.

During the period of which we have spoken, i. e., from the death of John Handley in 1895 to the adjudication by the Circuit Court of Frederick county in the above named cause on January 5, 1901, the estate of John Handley was being administered by the three executors named in his will, and for a clear understanding of the case presented on this appeal it is necessary to relate what transpired in the course of the administration of the estate at Scranton, Pa.

On January 2, 1896, under the law of Pennsylvania, the official appraisers of the city of Scranton summoned all parties in interest to Scranton for the purpose of determining the value of the Handley estate for the purposes of State taxation. Though the Handley executors, one of them a learned and distinguished lawyer, stood ready to do what they could to protect the interest of the estate, the city of Winchester, as one of the legatees, was notified, as a matter of course, and on December 31, 1895, the common council adopted the following resolution: "That the president (of the council) and the city solicitor (R. M. Ward) be authorized to represent the city at Scranton, Pennsylvania, on January 2, and in the event the city solicitor is unable to serve, that he and ——————— president be authorized to select some attorney in the place of the solicitor."

The official appraiser of Scranton assessed the value of the estate subject to taxation at $1,374,669.21, and from that ruling the executors appealed, and the appellate court reduced the value of the estate, for the purpose of taxation, to $886,869.21. Subsequently a compromise was entered into, by which the "inheritance tax" was fixed at $30,000, and the litigation over the tax question thus ended is spoken of in the record now before us as "the tax suit."

Early in 1896 a number of the heirs of Judge Handley residing in Ireland and elsewhere attacked the residuary clause of his will, which gave to the city of Winchester the residue of the estate for the purpose of establishing schools,

etc., and on June 2, 1896, after the passage of the act of
February 7, 1896, which it is claimed transferred to the Hand-
ley Board of Trustees the charge, custody, control, protec-
tion and administration of the Handley trust funds, the
common council of the city of Winchester adopted the fol-
lowing resolution: "Resolved, that the council appoint R. M.
Ward to assist the executors of the late John Handley in de-
fending the interests of the city of Winchester in the liti-
gation at Scranton, Pennsylvania, the compensation for such
services to be determined by the council."

On July 26, 1898, the council adopted a further resolu-
tion, authorizing the finance committee, "to contract with
Messrs. Conrad & Ward for a stated compensation for their
services, to be paid out of the funds in the hands of the
Handley trustees."

The litigation in Pennsylvania over the Handley will,
spoken of in this record as "the will suit," resulted in a de-
cision upholding the validity of the residuary clause of the
will, and thereafter, in April, 1902, R. M. Ward filed his bill
in equity in the Circuit Court of Frederick county against
the city of Winchester, and the Handley Board of Trustees
claiming that the two resolutions of the common council of
the city of Winchester, the one adopted December 31, 1895,
and the other June 2, 1896, constituted a contract of employ-
ment of the complainant, Ward, in the "tax suit" as well as in
the "will suit." The bill further averred that the complain-
ant had, in the line of his employment under said resolutions,
performed valuable services, and therefor demanded a fee of
$12,500, with interest, which amount, it was claimed, consti-
tuted an equitable lien on the fund in the hands of the Hand-
ley Board of Trustees. The cause was heard on demurrer to
the bill before Hon. C. E. Nicol, sitting for Judge Harrison,
who had declined to sit, and the bill was dismissed, on the
ground that the complainant had not complied with a con-
dition precedent to the right to sue, that he had first to de-

mand of the common council of the city of Winchester that they fix his compensation, etc.

In 1905, the complainant (R. M. Ward) again filed his bill against the same defendants, setting up about the same condition of facts as in his first case, viz., contracts with the city of Winchester through its common council, valuable service in the "tax suit" and in the "will suit," and then stated that he had made application to the council and the council had fixed his compensation at $2,000, etc., and charged a lien therefor upon the funds in the hands of the Handley Board of Trustees.

The Handley Board of Trustees demurred to this bill upon twelve grounds, stated in writing, all of which, by decree of September 15, 1906, were overruled, except the third, eleventh and twelfth, which were sustained, with leave to complainant to amend his bill. Between the bringing of the suit and this ruling of the court, R. M. Ward, the original complainant, had assigned his right of action to the Winchester Memorial Hospital, and the latter filed an amended bill in the cause, which recites the filing of the original bill by Ward, etc., the exhibits filed therewith and the proceedings had thereon, and prayed that the same be read and considered as fully as if particularly set forth in the amended bill. Then the amended bill set up, as matters of amendments, the resolution of the common council of June 2, 1896, the acceptance by Ward of the contract of service it offered, the performance of the service, the application of Ward to the city council to fix his compensation, and the fixing of it at the sum of $2,000; the assignment by Ward of his claim to the hospital, and charged that the hospital, as the assignee of Ward, was entitled to a lien for the $2,000, with interest, upon the funds in the hands of the Handley Board of Trustees, or to come into their hands.

The Handley Board of Trustees demurred to this amended bill upon all the grounds alleged against the original bill,

and upon four other grounds, stated in writing. All of these grounds were overruled by the decree of the Circuit Court of Alexandria city, to which the cause had been removed; whereupon the Handley Board of Trustees offered a plea of *res adjudicata*, and set up the record in the case of *Board of Handley Trustees* v. *City of Winchester*, to which we have adverted, the object of the plea being to show that the powers and duties of the common council of the city of Winchester and the Handley Board of Trustees, respectively, had been judicially determined, and that the Circuit Court of Frederick county, Judge T. W. Harrison presiding, had held that the act of February 7, 1896, *supra*, removed the common council from having any agency (touching the control, etc., of the Handley trust fund) and substituted the Handley Board of Trustees; and that this being the case, the common council had, thereafter, no authority to employ anyone to be paid out of the said trust fund, or to control the disposition thereof.

This plea was overruled by the Circuit Court of Alexandria city, by decree entered May 9, 1907; whereupon the Handley Board of Trustees answered the amended bill, denying, in substance, that the city of Winchester, as trustee, engaged the services of R. M. Ward, as alleged, because "after the act of February 7, 1896, the city of Winchester ceased to be trustee of the funds bequeathed by John Handley to the city, and ceased to have any control or custody of said funds, and the same were committed to the custody, government and control of the Handley Board of Trustees." The answer, besides denying the material allegations of the bill, further set up the defense, that R. M. Ward, being city solicitor at the time of his alleged contract with the city of Winchester for extra compensation for services to be rendered in respect to the Handley trust funds, the contract was without legal authority and, therefore, void.

The defenses set up in this answer were all overruled by

decree of January 11, 1908, in which it was adjudged that the assignee (Memorial Hospital) of complainant (Ward) of the claim of $2,000 with interest from July 7, 1903, was entitled to have it established as a lien upon "all funds now in the hands of the defendant (the Handley Board of Trustees), and it appearing from the evidence and the answer of said board of trustees that there is in its hands a large sum of money * * * * that the said claim be, and is declared a lien upon the said fund in the hands of the defendant * * * * and that the Winchester Memorial Hospital do recover of the Board of Handley Trustees the said sum of $2,000, with interest, etc., and the costs, etc., and that the defendant (Handley Board of Trustees) do pay the same out of the funds in its hands," etc. Said decree was reaffirmed by decree entered September 17, 1908, and it is from the last-named decree and that of January 16, 1907, that the cause comes here on appeal.

We have, perhaps, stated with greater elaboration than was necessary the origin of the litigation and the proceedings therein, but it was done for the purpose of having it clearly appear that the controversy is not merely between two charities, nor so much to contest the merits of the claim originally asserted by R. M. Ward and finally by the Winchester Memorial Hospital, to whom Ward had generously assigned his claim, fixed by the common council at $2,000, with interest, but that the real controversy is whether or not the city of Winchester, through its common council, has the authority, without the consent of the Handley Board of Trustees to charge with a debt or dispose of the Handley trust funds, or any part thereof.

With respect to the claim made by Ward and his assignee, we deem it proper to say, in fairness to him, that the record abundantly and conclusively shows that he rendered faithful and valuable service in the line of his employment by the city of Winchester with respect to the trust funds bequeathed

to the city by the Handley will, and that it could not be reasonably inferred that under the ordinances of the council employing Ward as city solicitor, year by year, at a salary of $100 the year, it was meant to embrace services in litigation outside of the State.

It is conceded by counsel for appellee that its recovery, if any, in this cause is by the pleadings confined to the sum of $2,000, with interest, as awarded by the council pursuant to the resolution of June 2, 1896; therefore, the controlling question for decision is, did the act of the legislature of February 7, 1896, *supra*, in fact remove the city of Winchester, represented by its common council, from the trusteeship of the Handley trust funds, and substitute as such trustee the Handley Board of Trustees; and, if this was the purpose and intendment of the act, did the legislature have the power and authority to pass the act?

That the act in terms accomplishes that result, there can be no question, as it appears to us; nor is there any room for doubt that the act provides for just what the common council of Winchester desired when it urged, through a selected committee, the legislature to pass the very bill prepared by this committee and which became the act of which we are speaking.

It will be recalled just here, that on December 3, 1895, before any contention was raised in respect to the Handley trust funds, the common council adopted a resolution, beginning with the words: "Whereas by the will of the late John Handley, large sums of money have been bequeathed to the city of Winchester; and whereas we are advised that the city cannot in its corporate capacity administer a bequest." Following this preamble was the resolution set out above, requesting the legislature to confirm and make self-perpetuating a board of trustees, composed of persons selected by the common council itself, to "receive and administer the said bequests."

Whether or not the city of Winchester, through its com-

mon council, could have in its corporate capacity received and administered the Handley bequests we are not called upon to determine. Certain it is that the city, through its common council, declined this trust and selected the board of trustees which the legislature, by its act, *supra*, authorized and empowered "to carry out the objects of the benefactions of the will of the late John Handley," etc.

That it was perfectly competent for the legislature to do what the act of February 7, 1896, plainly intended, viz., to divest the city of Winchester of the power to administer the trusts created by Handley's will, and confer that power and authority upon a board of trustees selected by the common council of the city, is, we think, clearly settled by the authorities.

Dillon, in his work on Municipal Corporations, Vol. 2, (4th ed.), sec. 567, states that it is firmly settled that municipal corporations, at least in this country, are capable, unless specially restrained, of taking property, real and personal, in trust for purposes germane to the objects of the corporation, or which will promote, aid, or assist in carrying out or perfecting those objects; that such corporations may become *cestuis que trust*, within the scope of the purposes for which they are created; and that where the trust reposed in the corporation is for the benefit of the corporation, or for a charity within the scope of its powers or duties, it may be compelled, in equity, to administer and execute it. "But," continues the learned author, "the *legislature may, in the absence of constitutional restriction on its power, divest a municipal* corporation of the *power to administer the charitable trusts* conferred upon it, and appoint or provide for the appointment of new trustees independent of the corporation, and vest in them the management of such trusts."

Supporting this text, the case of *Philadelphia* v. *Fox*, 64 Pa. St. 169, is cited, and in that case the constitutionality of the act of June 30, 1869, *depriving the city of Philadelphia of*

*the power to administer the trusts under wills of Mr. Girard and others*, and vesting the powers of the city in this respect in an independent and separate board, not appointed by the city, was sustained. The opinion in that case by Mr. Justice Sharswood reviews at length the authorities and fully sustains the proposition, that the legislature has the power to displace a municipal corporation as trustee appointed to administer charitable trusts, and substitute in place of the corporation a board of trustees, even without the consent of the municipal corporation; and if this may be done without such consent, *a fortiori*, the power of the legislature may be exercised where the municipal corporation declines a trust or assents to the action of the legislature in creating a board of trustees to administer the trust in the place and stead of the. municipal corporation. The opinion in that case further says: "This whole question is put at rest, and that as to one of the most important of these trusts and as to its trustees, by the opinion of the Supreme Court of the United States in *Girard* v. *Philadelphia*, 7 Wall. ·14, (19 L. Ed. 53)."

In that case, the opinion by Mr. Justice Grier, after saying what has been quoted by Dillon in the text above referred to, says: "Nor can a valid vested estate, in trust, lapse or become forfeited by any misconduct in the trustee, or inability in the corporation to execute it, if such existed. Charity never fails; and it is the right, as well as the duty of the sovereign, by its courts and public officers, as also by legislation (if needed), to have the charities properly administered."

In the case of *Vidal* v. *Girard's Executors*, 2 How. 127, L. Ed. 205, the learned opinion by Mr. Justice Story fully sustains the proposition that the legislature of a State has the power, in the absence of constitutional inhibition, to provide for the execution and administration of a charitable trust to a municipal corporation by an agency created by act of the legislature in the place and stead of the corporation itself.

See also *U. S.* v. *Railroad*, 17 Wall, 322, 21 L. Ed. 597, where,

though the question involved was the right of taxation, the same principle is recognized—that is, that the State, through its legislative branch of government, may control and direct the administration of a charitable trust conferred upon a municipal corporation. *Inhabitants of North Yarmouth* v. *Skillings*, 45 Mo. 133, 71 Am. Dec. 530.

It is very true that the act in question reserves to the common council of the city the right to "superintend and direct the custody and investment of the funds arising under the said will," and provides that "no plan for the ultimate application of said funds, in whole or in part, for the purposes of said will shall be valid until the same has been reported to and approved by the common council of the city of Winchester," but neither this language nor any other contained in the act can be construed as a reservation of a right in the city, through its council, to contract a debt against and create a lien therefor upon the trust funds.  To so construe the statute would be to say that after its enactment there were two independent trustees with inconsistent powers touching the Handley trust funds; and, further, that the Handley Board of Trustees were without the power to *control* the fund which the statute placed in their charge, and without power to protect it from the demands of the governing body of the city of Winchester.  The act of February 7, 1896, as was intended, separated the common council from the control of the Handley funds, except in the particulars specified, going so far as to provide that "no one shall hold the office of councilman and that of the trustee at the same time."  There was left in the common council of the city only the power to supervise a plan for the ultimate disposition of the funds, the power to elect the trustees, and the power to require of these trustees annual reports, but reposed in the council no power, trust, control or right of any description over the Handley funds.  As well said by the learned judge of the Circuit Court of Frederick county (Hon. T. W. Harrison) in his opinion quoted

from above: "The said statute removed the common council from having any agency in the premises, and substituted the board of trustees. This board is the agent of the city and its people, and its mouthpiece in all matters pertaining to this trust. It is not that the city has abandoned anything, but that it has substituted a new agency which shall represent it and which shall represent the people, and which shall speak for it in lieu of the common council, which but for the statute would have been the mouthpiece of the corporation."

That it was wise in the leading citizens of the city and in its common council, upon hearing of the beneficent bequests from Judge Handley, to set about to prevent these benefactions from becoming the subject of political activity, and to provide against the purposes intended by the benefactor being intrusted to the common council with its multitudinous duties, and to the city's government whose personnel changes in some degree, if not altogether, every two years, there seems to be no sort of room to doubt. Nor can it be questioned, we think, that the action of the legislature, taken at the request of the common council, providing for the appointment of a self-perpetuating board of trustees and vesting in this board the control and management of the Handley funds, independent of any power or authority of the city with respect to them, except a supervisory control thereof, was eminently wise and for the best interests of all who were intended to be benefited by those funds.

We are of opinion, upon the whole case, that the decrees of the circuit court complained of are erroneous, and they are reversed; and this court will enter the decree that the circuit court ought to have entered, dismissing the amended bill of the Winchester Memorial Hospital, with costs to appellant.

*Reversed.*