CAROLINE SALTONSTALL & others *vs.* CHARLOTTE SANDERS & others.

A testator bequeathed the residue of his estate to his executors in trust to hold and invest the same and the income thereof, and appropriate so much or the whole of the principal or income as they might think proper " to the furtherance and promotion of the cause of piety and good morals, or in aid of objects and purposes of benevolence or charity, public or private, or temperance, or for the education of deserving youths," and gave said trustees and their successors "·full power, discretion and authority to appropriate and expend said income or capital in such manner as in their judgment may best promote the objects above mentioned." *Held,* that by " objects and purposes of benevolence or charity, public or private," the testator intended general relief of the poor, either through public institutions or almsgiving by the agency of individuals; and that this was a good charitable bequest.

BILL IN EQUITY, brought by certain of the next of kin and heirs at law of Charles Sanders, late of Cambridge, deceased, against the executors of his will, and certain others of the next of kin and heirs at law, who refused to join as plaintiffs, seeking to have the residuary clause of his will declared void, and the residue of the estate administered as in case of intestacy. The residuary clause was as follows:

" All the rest and residue of my estate I give and bequeath to Charlotte Sanders, James C. Merrill and Leverett Saltonstall, my executors hereinafter named, and the survivor of them, their and his executors, administrators and assigns, as trustees, in trust to hold and invest the same and the income thereof, in such manner as may seem to them expedient; and so much or the whole of the principal or of the income as they may think proper, after providing for all the purposes above named and for all contingent expenses, to appropriate to the furtherance and promotion of the cause of piety and good morals, or in aid of objects and purposes of benevolence or charity, public or private or temperance, or for the education of deserving youths; and give my said trustees, or the survivor of them, and their succes· sors in said trust for the time being, full power, discretion and authority to appropriate and expend said income or capital in such manner as in their judgment may best promote the ob jects above mentioned."

The bill alleged that the estate had been fully administered, with the exception of said residuary bequest, and that the residue of the estate amounted to more than $300,000.

The defendants filed a general demurrer.

The attorney general was also, by an amendment, made a defendant, and appeared and agreed that the case might be reserved upon the bill and demurrer, reserving his right to answer after the demurrer should be disposed of.

The case was thereupon reserved by *Gray*, J., upon the bill and demurrer, for the determination of the whole court.

*B. F. Thomas & W. C. Endicott*, (*H. W. Paine* with them,) for the defendants. The jurisdiction of the court of chancery in England over charities was not derived from *St.* 43 Eliz. *c.* 4, but existed before its passage. *Incorporated Society* v. *Richards*, 1 Dru. & War. 258, and cases there cited. *Attorney General* v. *Mayor, &c. of Dublin*, 1 Bligh N. R. 347. And that statute does not confine that jurisdiction to the cases of charitable uses therein enumerated. *Tappan* v. *Deblois*, 45 Maine, 122. The enumeration there made has been practically abandoned. See *Vidal* v. *Girard*, 2 How. 195, and Binney's argument therein, 151–160; Dwight's Charity Cases, and his argument in the Rose Will case; *Perin* v. *Carey*, 24 How. 501. There are certain things now recognized as charities which perhaps would not have been, but for the *St.* of Eliz. But the doctrine of charity had an earlier origin. And the enforcement of charitaable uses cannot be limited to any narrow or stated formula. It must expand with the advancement of civilization, and the daily increasing needs of men. New discoveries in science, new fields and opportunities for human action, the differing condition, character and wants of communities and nations, change and enlarge the scope of charity, and where new necessities are created new charitable uses must be established. Practically this view has often been sustained by courts of chancery, even while adhering in theory to the strictest construction of the law of charitable uses. [The counsel referred to various cases cited in the opinion, and also to those which follow.] *Loscomb* v. *Wintringham*, 13 Beav. 87. *In re Beloved Wilkes*, 3 Macn. & Gord. 440.

*Mills* v. *Farmer*, 19 Ves. 482. *Attorney General* v. *Lonsdale*, 1 Sim. 105. *Jones* v. *Williams*, Ambl. 651. *West* v. *Knight*, 1 Cas. in Ch. 134. *Nightingale* v. *Goulburn*, 5 Hare, 484; *S. C.* 2 Phil. R. 594. *Powerscourt* v. *Powerscourt*, 1 Molloy, 616. *At torney General* v. *Heelis*, 2 Sim. & Stu. 67. *Howse* v. *Chapman*, 4 Ves. 542. *Faversham* v. *Ryder*, 5 De G., Macn. & Gord. 350. *Attorney General* v. *Stepney*, 10 Ves. 22. *Attorney General* v. *Gladstone*, 13 Sim. 7. *West* v. *Shuttleworth*, 2 Myl. & K. 684. *Lloyd* v. *Lloyd*, 2 Sim. (N. S ) 255. *Ashton* v. *Langdale*, 4 De G. & Sm. 402. *Attorney General* v. *Wallace*, 7 B. Monr. (Ky.) 611. *Chambers* v. *St. Louis*, 29 Missouri, 543. *Sweeney* v. *Sampson*, 5 Indiana, 465. *Cresson's Appeal*, 30 Penn. State R. 437. *Shotwell* v. *Mott*, 2 Sandf. Ch. 46. *Coggeshall* v. *Pelton*, 7 Johns. Ch. 292. *Derby* v. *Derby*, 4 Rhode Island, 414. *Winslow* v. *Cummings*, 3 Cush. 358.

The English law of charitable uses exists in Massachusetts, and has always been enforced so far as the courts had jurisdiction. And the want of jurisdiction to enforce a charitable bequest does not affect its validity. See *Bartlet* v. *King*, 12 Mass. 537; Anc. Chart. 52, 93, 94, 222; *King* v. *Parker*, 9 Cush. 81; Const. of Mass. *c.* 5, § 2; *Sts.* 1817, *c.* 87; 1857, *c.* 214; Gen. Sts. *c.* 113, § 2, second and last clauses. From the beginning, it has been the policy of the Commonwealth to cherish and support gifts and devises to benevolence and charity, using those terms in the most liberal sense. See *Drury* v. *Natick*, 10 Allen, 177–183, and cases cited; *Dexter* v. *Gardner*, 7 Allen, 243, and cases cited; *Earle* v. *Wood*, 8 Cush. 445, and cases cited; *Wells* v. *Heath*, 10 Gray, 17.

The intent of the testator was to devote the residue of his estate to charity. He had in mind four objects: 1. The promotion of piety and good morals; 2. The aid of objects and purposes of benevolence or charity, public or private; 3. Temperance; 4. The education of deserving youth. The 1st, 3d and 4th objects are clearly charitable. The only question as to the 2d arises from the use of the words "benevolence" and "private." These words do not render the bequest void, or show that it was not a gift to charity.

If there are two meanings to a word, one of which will effect-uate and the other defeat the testator's object, the court will select the former. *Whicker* v. *Hume*, 7 H. L. Cas. 154. "Be-nevolence," in its popular sense and use, is synonymous with charity. These terms are used interchangeably in common speech, in the books, and in the statutes. [The counsel referred to some of the statutes cited in the opinion.] The testator intended to provide for the relief of the poor. He used the word "benevolence" in its popular sense, meaning well doing and not well wishing; just as he used "temperance" in its popular sense, and not as meaning moderation or forbearance. The question to be decided is, what this testator meant by the word "benevolence;" not what the word means etymologically, or as used in any other connection whatever.

The words "public or private," as used in this will, do not defeat the charity. They refer merely to the instrumentality, or the method of administering the charity. The scope and reach of the charity are general, though the hand that administers it is private. Every individual in the community may be the recipient of it.

If the description of the second object can be held to be un-certain, the other three are plain, and there may be a propor-tional division. *Doyley* v. *Doyley*, 7 Ves. 58, *n. Longmore* v. *Brown*, Ib. 124. *Salusbury* v. *Denton*, 3 Kay & Johns. 529. *Mills* v. *Farmer*, 1 Meriv. 55. *Penny* v. *Turner*, 2 Phillips R. 493.

*S. Bartlett*, (*G. Wheatland* with him,) for the plaintiffs. There are two principles on which this case turns. 1. The first is one in no way connected with the doctrine of charities, but is one of universal application in equity jurisprudence, namely, that no valid trust can be created which leaves an uncontrollable power of disposition by the trustees, since, to use the language of Sir William Grant, "an uncontrollable power of disposition would be ownership, and not trust." "Every trust (except char-itable) must have a definite object. There must be somebody in whose favor the court can decree performance." "If there be a clear trust, but for uncertain objects, the property that is the

subject of the trust is undisposed of; and the benefit of such trust must result to those to whom the law gives the ownership in default of disposition by the former. owner." *Morice* v. *Bishop of Durham*, 9 Ves. 399–405. This precise doctrine is confirmed by Lord Eldon on appeal. 10 Ves. 522. Where it is said that a clear trust for uncertain objects results to the heir at law or next of kin, it merely affirms a common doctrine of equity, that, unless there be something to show that a trust which fails is designed for the benefit of the trustee, it results to those who would take if there had been no such disposition of the property. In *Ommanney* v. *Butcher*, Turn. & Russ. 260, 272, this same principle is stated with great. force, thus : " Liberality and benevolence include charity, but they are not convertible terms. The case therefore not ranking under those which belong to charity, the question came to be considered, whether the purpose was sufficiently definite for the court to execute. The court held that it was not. The fund therefore belonged to next of kin." It may, we think, be confidently stated that no case can be found that impugns this doctrine. See *Fowler* v. *Garlike*, 1 Russ. & Myl. 232 ; *Stubbs* v. *Sargon*, 2 Keen, 255 ; *S. C.* 3 Myl. & Cr. 507.

2. The second principle is, that whensoever the trustees have an election to apply the whole fund to purposes not technically charitable, (although they may elect, under the terms of the disposition, to apply the same to technical charities,) yet the trust is void, and results to the heir at law or next of kin, because this election places the whole beyond the control of the court, and would thus enable the trustees, as against everybody but the heir at law, to use or misuse the fund at their own discretion. Upon this point it is believed, also, wheresoever an alternative is given to the trustees, the authorities are uniform. The two latest cases would seem to be *Mitford* v. *Reynolds*, 1 Phillips R. 185–190, where Lord Lyndhurst says, " If these words are to be taken distributively and not conjunctively, and any one of the purposes or of the alternatives would not create a valid charitable bequest, the whole disposition will, of course fail. Upon that point no doubt can be entertained." In *Nas⸗*

*v. Morley,* 5 Beav. 177, 183, Lord Langdale says, " If there be any option in the trustee to apply the funds to purposes which, though liberal or benevolent, are not such as in this court are understood to be charitable, the trusts cannot be executed here."

Under this will, the trustees have an absolute and uncontrollable power to dispose of this fund. The will authorizes them " to hold and invest the same, and the income thereof, in such manner as may seem to them expedient ; " and to appropriate to the objects which are named " so much or the whole of the principal or of the income as they may think proper ; " and it gives to them, or the survivor of them, and their successors, " full power, discretion and authority to appropriate and expend said income or capital in such manner as in their judgment may best promote " those objects.

If treated as a mere trust, this bequest would be void, as within the doctrine against perpetuities, since the testator contemplated that it might endure beyond the life of the last survivor of the trustees, and be executed by remote successors. But since some of the purposes of the trust to which, by the election of the trustees, the fund may be devoted are charitable, the question is whether, by reason of this feature, the trust can be supported ; and if not, then whether, within settled rules, it is too indefinite to be executed, and so the fund results to the heirs at law.

The doctrine is thus stated in Tudor on Charitable Trusts, 223 : " Where however a bequest is made for charitable purposes, and also for purposes of an indefinite character which are not charitable, the whole bequest will be void. If, for instance, a bequest is made for such charitable or other purposes as the trustees should think fit, the whole bequest will be void for uncertainty." See also *Vezey* v. *Jamson,* 1 Sim. & Stu. 69 ; *Williams* v. *Kershaw,* 5 Law Journ. (N. S.) (Ch.) 84 ; *Ellis* v. *Selby,* 1 Myl. & Cr. 286 ; *Kendall* v. *Granger,* 5 Beav. 300 ; *Thompson* v. *Thompson,* 1 Colly. R. 398. The principle of all these cases is, that the portion of the trust that might otherwise be construed as charitable cannot be sustained, because the trustees have an election to apply the fund to purposes not technically charitable

and as to the gifts to purposes not charitable, they are held void because too vague and indefinite to be administered by a court of equity. And in all of these cases, the trust is declared a resulting one for the next of kin. See also cases collected in Hill on Trustees, 116.

The only cases that seem to militate with the above, and numerous others which might be cited, are *Waldo* v. *Cayley*, 16 Ves. 206, and *Horde* v. *Earl of Suffolk*, 2 Myl. & K. 59. But Lord Cottenham declares, in *Ellis* v. *Selby*, that the former was decided before it was settled that a private charity could not be carried into effect in a court of chancery, and that in the latter Sir John Leach omitted to notice the point; and also in *Williams* v. *Kershaw*, that as Sir John Leach took no notice of the objection he could not be considered to have overruled the point.

The above doctrines are applicable to the words of this will. The trustees are authorized to apply the whole fund to either of the objects named. One of these objects is "private benevolence;" and private benevolence is not a charity. *Morice* v. *Bishop of Durham*, and *Ommanney* v. *Butcher*, above cited. *James* v. *Allen*, 3 Meriv. 17.

It is said by the counsel for the defendants that it is not necessary to resort to the *St.* of Eliz. to determine what is a charity; and, from the fact that jurisdiction in equity was exercised over charities prior to that statute, it is inferred that the charities come from elsewhere. But that fact settles nothing. The *St.* of Eliz. was passed on account of the excesses which had prevailed; and it professes to be in restraint, and to define. Tudor on Charitable Trusts, 2. *Wright* v. *Methodist Episcopal Soc.*, Hoffman Ch. 262, 264. That statute, therefore, determines what are public charities. The provision in our constitution, which has been referred to, enjoining magistrates to countenance principles of general benevolence, was not designed to encourage a violation of the common law as to perpetuities. And every one of the large array of cases cited for the defendants will be found to fall within three settled heads of charity jurisdiction, namely the poor; pious uses; or the advancement of general learning

or public uses. Some of the cases have public and private char ities coupled together; and in such cases another question arises, what disposition will be made of the fund. See *Williams* v. *Kershaw*, above cited. *Brown* v. *Kelsey*, 2 Cush. 243. Boyle on Charities, 283. In the present case the objects of the trust are not coupled together, but are presented in the alternative. And in such a case there is no decision that there can be an apportionment.

GRAY, J.* The general principles upon which the parties re- spectively rely are not controverted. It is not doubted that a bequest in trust for such charitable uses as the trustees may think fit is valid, although declared to be perpetual. On the other hand, it is admitted that a trust, which may by its terms endure forever, for undefined purposes, not charitable in the view of a court of chancery, is void, and results to the heirs of the donor ; and that a bequest to trustees, to apply the income in their discretion to charitable purposes or other purposes not charitable, is void, at least in part.

The question to be determined is whether the residuary be- quest in the will of Charles Sanders is limited to charitable pur- poses. After providing for the payment of his debts and funeral expenses, and various legacies and bequests, including one to the town of Gloucester, the place of his ancestors, and one to the city of Cambridge, the place of his residence, of ten thou- sand dollars each, to be held as a permanent fund, and the interest paid quarterly, " as long as the vice of drunkenness there exists," " to some worthy man in each place, who has discretion and zeal for the cause, to be constantly employed as a missionary in the cause of temperance, in reforming old drunkards and pre- venting young drunkards, and abolishing, as far as possible, the use of all intoxicating articles," the testator gives the residue of his estate to his executors and the survivor of them, their and his executors, administrators and assigns, " as trustees, in trust to hold and invest the same and the income thereof, in such manner as may seem to them expedient ; and so much or the

---

* This case was argued at the end of this term before all the judges but COLT, J

whole of the principal or of the income as they may think proper, after providing for all the purposes above named and for all contingent expenses, to appropriate,"

First, " to the furtherance and promotion of the cause of piety and good morals, or "

Secondly, " in aid of objects and purposes of benevolence or charity, public or private, or "

Thirdly, " temperance," (which is shown by the previous clause, above quoted, to have been used by the testator in its modern and limited sense of restraining the abuse of intoxicating liquors,) " or "

Fourthly, " for the education of deserving youths."

He then adds, " And I give my said trustees, or the survivor of them, and their successors in said trust for the time being, full power, discretion and authority to appropriate and expend said income or capital in such manner as in their judgment may best promote the objects above mentioned."

The learned counsel for the plaintiffs admit the advancement of religion and morality, the prevention of vice, and the education of youth, as contemplated in the first, third and fourth of these classes of objects, to be charitable uses ; and seek to maintain their bill only upon the ground that the words describing the second class are so vague as to permit the trustees to expend the fund for purposes of an undefined character which are not charitable, and that the whole residuary bequest is therefore void. The specific objections made are two; that the trustees may apply the property to private charity; or to benevolent purposes which are not charitable at all.

But after deliberate advisement, and careful examination of the authorities cited, the court is unanimously of opinion that neither of the objections is well taken, and that the aim of the clause in question is the general relief of the poor, which all admit to be a charitable use. We have therefore no occasion in this case to consider the source and extent of the principles and jurisdiction of chancery in the matter of charities before the *St.* of 43 Eliz.

This bequest is to receive such an interpretation, if possible,

as will carry out the intention of the testator. A charitable gift, above all others, is to be so construed *ut res magis valeat quam pereat.* As Lord Chancellor Chelmsford said, in the most recent case in the house of lords upon the construction of general charitable bequests, " If there are two meanings of a word, one of which will effectuate and the other will defeat the testator's object, the court is bound to select that meaning of the word which will carry out the intention and objects of the testator." *Whicker* v. *Hume*, 7 H. L. Cas. 154. And it is not for this court to forget that the Constitution of Massachusetts declares (in words which may be supposed to have been in the mind of this testator when he framed his will) that " it shall be the duty of legislatures and magistrates, in all future periods of this common-wealth, to countenance and inculcate the principles of humanity and general benevolence, public and private charity." Constitution of Massachusetts, *c.* 5, § 2.

To say that a trust cannot be administered by a court of chancery, and therefore is not a charity, is to reason backwards, or in a circle. The jurisdiction of a particular court is not the test of what is a charity; but any trust which is charitable, although too indefinite in its terms to be sustained if it were a private trust, may be controlled and administered by a court of full equity jurisdiction. Even the want of any court vested with jurisdiction to enforce it does not affect the validity of a charitable trust. *Bartlet* v. *King*, 12 Mass. 544, 545. *King* v. *Parker*, 9 Cush. 81. *Vidal* v. *Girard*, 2 How. 196.

The assistance of the poor is required not only by the moral and religious duty of every citizen, but by a sound public policy and a regard for the interests of the whole community. A gift " to the poor " generally, or to the poor of a particular town, parish, age, sex or condition, is a good charitable gift. It is the number and indefiniteness of the objects, and not the mode of relieving them, which is the essential element of a charity. It makes little difference to the contributors, the poor, or the public, and none in the nature of the charity, what is the mode of distributing relief. In the eye of the law, as of Christianity, almsgiving in secret is not less meritorious or charitable

than the more open assistance of the poor in almshouses and hospitals. In every act of relieving the poor, by whatever means, the immediate benefit is to the individual. Hunger, nakedness, disease, are personal, and the relief is also personal and in one sense private. A good charitable use is "public," not in the sense that it must be executed openly and in public; but in the sense of being so general and indefinite in its objects as to be deemed of common and public benefit. Each individual immediately benefited may be private, and the charity may be distributed in private and by a private hand. It is public and general in its scope and purpose, and becomes definite and private only after the individual objects have been selected.

The *St.* of 43 Eliz. *c.* 4, to which we are accustomed to recur for the most familiar examples of charitable uses, enumerates many which consist in the first instance, if not chiefly, in the benefit conferred on individuals. Such certainly are " relief of aged, impotent and poor people," " maintenance of sick ·and maimed soldiers and mariners," " education and preferment of orphans," " marriages of poor maids," " supportation, aid and help of young tradesmen, handicraftsmen and persons decayed," and " relief or redemption of prisoners and captives."

The law upon this matter appears very clearly in the judgments of Lord Hardwicke, which are of the highest authority, both from his unsurpassed mastery of the principles of equity jurisprudence, and as having been delivered before the separation of the United States from the crown of Great Britain.

The earliest case reported is one in which a testator, after fixed pecuniary legacies to a certain number of ministers and clergymen, poor decayed families, poor widows, maidens and boys, to be performed at the discretion of his executors, the qualifications of the persons to be relieved being duly weighed and considered ; and bequests to persons and ·charitable institutions, to be paid as his executors should judge best; gave the surplus " to be distributed to widows or poor orphans of nonconformist ministers, not being at the time worth upwards of £100 a year, and widows being upward of fifty years of age," " to be paid in such proportions and to such numbers only, be the same more or less

as his executors should judge meet." Lord Hardwicke, in the exercise of his jurisdiction over public charities, sustained an information by the attorney general to ascertain and direct the mode of distribution by the executors. *Attorney General* v. *Glegg,* Ambl. (2d ed.) 584, 585, *note ; S. C.* 1 Atk. 356 ; *S. C. nom. Attorney General* v. *Speed,* West Ch. 491.

The next case more conclusively shows that a gift to poor individuals of a particular class, though to be distributed by a private hand, is still a charity and a public charity. Mrs. Squire by her will gave legacies to her servants and other persons; to certain charity schools and hospitals ; " to poor housekeepers, to be distributed to such of them and in such a manner as Mrs. Northcote and Mrs. Green should appoint ; " " to the Parish of South Morlton ; " and " to the Parish of Sunnyhill, to be distributed amongst those that were at that time lame or visited with sickness ; " and made Mrs. Northcote her executrix. After Mrs. Squire's death, Mrs. Northcote made a will by which she gave " to all the public charities to which dear Mrs. Squire has given any legacies by her will £100 a piece." Mrs. Northcote's residuary legatees insisted that Mrs. Squire's legacies to be distributed to such poor housekeepers as Mrs. Green and Mrs. Northcote should appoint, and to the sick and lame of Sunnyhill, were private charities, and therefore not, like those to charity schools and hospitals, to be increased by Mrs. Northcote's bequest to " all the public charities " named by Mrs. Squire. But Lord Hardwicke held both of them to be public charities, saying, " The charter of the crown cannot make a charity more or less public, but only more permanent than it would otherwise be ; but it is the extensiveness which will constitute it a public one. A devise to the poor of a parish is a public charity. Where testators have not any particular person in their contemplation, but leave it to the discretion of a trustee to choose out the objects, though such person is private, and each particular object may be said to be private, yet in the extensiveness of the benefit accruing from them they may very properly be called public charities. A sum to be disposed of by A. B. and his executors, at their discretion, among poor

housekeepers, is of this kind." *Attorney General* v. *Peirce* Barnard. Ch. 208; *S. C.* 2 Atk. 87.

In another case, in which a testator, in case of his son's dying under age, gave to his executors his real estate " for such charitable uses and purposes as I shall direct by codicil or otherwise," and his personal estate to " be disposed of among widows and orphans of dissenters and to my poor relations, in such proportion as they shall think fit; " and by a codicil, expressed to be made pursuant to the first clause in the will, directed the real estate to be sold or held by the trustees, and the purchase money or income applied or distributed among such persons or to and for such uses and purposes and in such manner as the testator should in writing appoint, and, for want of such appointment, as the trustees should judge fit and convenient; Lord Hardwicke held that, taking the will and codicil together, there was no resulting trust for the heir, but a good disposition to charitable uses; and said, " The expression in the codicil ' upon such persons and to and for such uses ' are common words in devises to charity." *Cook* v. *Duckenfield*, 2 Atk. 562, 567. Again; where a testator gave out of certain property specific sums, amounting to its then income, to various charities, including thirty shillings yearly on certain days to be disposed of in bread among the poor of the parish, and £5 10*s.* more to " be yearly disposed of forever in relieving the distressed and poor about Guerendue in meat and drink and clothing, at the discretion of his executor forever," Lord Hardwicke held that the whole income of the estate was well given to charitable uses. *Attorney General* v. *Johnson*, Ambl. (2d ed.) 190, *&· note.* He also established as public charities trusts of unlimited duration to be applied for the benefit of poor relations of the testator at the discretion of his executor, than which it would be hard to imagine anything more private in the class of individuals benefited or in the mode of distribution. *Attorney General* v. *Bucknall*, 2 Atk. 328. *Isaac* v. *De Friez*, 17 Ves. 373, *note ; S. C.* Ambl. 595.

The law seems to have been understood in the same way by the highest legal authorities in the Province of Massachusetts before the American Revolution. In 1760 John Alford made a

will by which he gave the residue of his estate, real and personal, " to charitable uses, private or more public, such as may be thought most agreeable to the mind and will of God, the Giver of them all, as recorded to us in his holy word, and the good of those who shall be thought the most suitable objects for it; the houses and lands unimproved, as well as those under improvement, to be sold as advantageously as may be, and the money collected and put under the best improvement by my executors hereafter mentioned, for those uses and services ; they asking the advice of some reverend and good gentlemen as occasion may need and require." In 1761 this will was presented for probate by Edmund Trowbridge and Richard Cary, the executors named therein, and allowed by the probate court of Middlesex, from whose decree the widow and heirs appealed to the governor and council as the supreme court of probate, alleging as reasons of appeal that the testator was not of sound and disposing mind, and that " the said paper in many parts thereof is manifestly unintelligible, and no intention or will can be collected by any rules of law from the words of it," which last has been since held by this court to be no ground for refusing probate of a will. *Hawes* v. *Humphrey*, 9 Pick. 350, 362. After argument in the supreme court of probate by James Otis and Oxenbridge Thacher for the appellants, and Jeremy Gridley and Robert Auchmuty for the appellees, the parties referred the points in dispute to Thomas Hutchinson, (then lieutenant governor and chief justice of the province,) two other members of the governor's council, and Gridley and Otis, the leading counsel of both parties, for their advice. The first point thus referred was whether the executors could compound with the widow and heirs on such terms as might appear to the executors to be just and reasonable, if materially variant from the will. Upon which the referees said, " That inasmuch as exception hath been taken to the sanity of the said Colonel Alford at the time of executing his pretended will and for divers years before, and also to the legality of the residuary devise, admitting him to have been of sound mind, and it being very uncertain how far those exceptions may finally prevail, and there being no particular person or body corporate who by virtue of the said will

can lay claim to the said residuary devise or any part thereof we are therefore of opinion that you may safely and equi tably compound with the widow and heirs, although such composition should be a departure from the said will." This advice was agreeable to the practice of courts of chancery, which sometimes allow a compromise of a contested charity case, requiring however the consent of the attorney general as being the proper officer to see to the execution of charities in such courts. Tudor on Charitable Trusts, (2d ed.) 153. The second point concerned the mode of carrying out the composition, by affirming, in the supreme court of probate, the decree of the court below. The third point related to the proportions to be allowed to the widow and heirs, and retained by the executors, which the referees, upon a consideration of the provisions of the will and the circumstances of the case, fixed at six tenths and four tenths respectively. The remaining question was, " To what particular use or uses may that residue be best applied, consistent with the will of the donor?" To which the referees answered, " We advise you to consult with some reverend good gentlemen, and then apply the four tenths aforesaid to such pious and charitable use as you in your discretion shall think most fit and proper." The parties then executed an indenture, reciting and carrying out the advice of the referees, which the supreme court of probate ordered to be recorded in their registry, gave liberty to the appellants to withdraw their appeal, and affirmed the decree of the probate court. *Winslow* v. *Trowbridge*, Supr. Prob. Rec. 1762–63, fol. 28–40. As there was then no court of chancery here, there could hardly be better evidence of the law of the province than this deliberate advice of the chief justice and the two greatest lawyers in Massachusetts at that time.

In *Washburn* v. *Sewall*, 9 Met. 280, this court held that a gift to an unincorporated voluntary association of women, having for its objects the providing of groceries for the sick and infirm, and clothing and fuel for the helpless and needy was a good charitable gift. See also *King* v. *Parker*, 9 Cush. 82. And Chancellor Kent, adopting as his guide Lord Hardwicke's judgment in *Attorney General* v. *Peirce*, above cited, says, " It is the

extensiveness of the object that constitutes it a public charity A charity may be public, though administered by a private cor poration. A devise to the poor of a parish is a public charity." 2 Kent Com. (6th ed.) 276.

The English decisions of the greatest weight since our Revolution maintain the same principles.

Lord Eldon established and carried out a bequest of £30,000 to trustees, to be invested forever, and the income paid " unto and amongst such number of the poor inhabitants of " certain parishes, " at such times and in such proportions, and either in money, provisions, physic or clothes, as his said trustees or the major part of them for the time being shall from time to time think fit, for the better support and maintenance of such poor inhabitants." *Bishop of Hereford* v. *Adams*, 7 Ves. 324. He also held that the general residue of an estate was given to charitable purposes by the following words : " All the remainders of my different bequests I give and bequeath to the Archbishop of Canterbury and to the Archbishop of York for the time being, in trust for charitable purposes, and anything not specified I commit to the discretion of my executors. I desire my executors to make some donation out of my property to the poor of the different places where I have estates." *Paice* v. *Archbishop of Canterbury*, 14 Ves. 364.

Sir William Grant sustained as charitable a residuary bequest " to the widows and orphans of seamen belonging to the town of Liverpool ; " and ordered it to be paid to the rectors of Liverpool and their successors, to be by them invested, and the interest paid and distributed unto and amongst such poor sailors' widows and orphans, inhabitants of Liverpool, as should in their judgment be deserving objects of charity. *Powell* v. *Attorney General*, 3 Meriv. 48. He also followed Lord Hardwicke's decisions as to permanent trusts for the assistance of poor relations, saying of such a bequest in one case, " It is to have perpetual continuance in favor of a particular description of poor, and is not like an immediate bequest of a sum to be distributed among poor relations." *Attorney General* v. *Price*, 17 Ves. 371. *White* v. *White*, Boyle on Charities, 34, 35 ; *S. C.* 7 Ves. 423.

More exactly in point is the case in which these two eminent judges sustained as a valid charity a bequest of income to be expended " in promoting charitable purposes, as well those of a public as of a private nature, and more especially in relieving such distressed persons, either the widows or children of poor clergymen, or otherwise, as my said wife shall judge most worthy and deserving objects ; giving a preference always to poor relations." *Waldo* v. *Caley*, 16 Ves. 206. In another case, Lord Eldon, affirming a decision of Vice Chancellor Leach, held a bequest " If there is money left unemployed, I desire it may be given in charity," to be a valid gift of the residue of the personal estate. *Legge* v. *Asgill*, Turn. & Russ. 265, *note*.

Sir John Leach also held a bequest to trustees " for the benefit of such public or private charities as they in their discretion might think fit " to be a valid charitable donation. *Johnston* v. *Swann*, 3 Madd. R. 457. And after he had become master of the rolls, he sustained a bequest of an annuity to the testator's wife, " to be by her distributed in charity according to her own discretion and judgment, either to private individuals or public institutions, in such sum or sums, way and manner as she shall from time to time choose, without limitation or control from any person whomsoever ; " and a residuary bequest to trustees, to be continued at interest, and the dividends " given away in charity either to individual persons or to public institutions," with like unlimited discretion. *Horde* v. *Earl of Suffolk*, 2 Myl. & K. 59.

The decision which goes farthest to support the position of the plaintiffs as to the meaning of the words " private charity " is that in *Ommanney* v. *Butcher*, Turn. & Russ. 260. There a testator, after legacies to certain individuals, and to various schools, hospitals, and other religious and charitable institutions of which he was a governor or trustee, added, " In case there is any money remaining, I should wish it to be given in private charity." Sir Thomas Plumer, M. R., held this last bequest too indefinite to be carried out, either by the sign manual of the crown, or by the ordinary jurisdiction in chancery. The opinion does not show that degree of thought and research which

characterizes most of the judgments of that learned person. His statement that there was no case in which private charity had been acted upon by the court is inconsistent with the long line of authorities above quoted, not one of which is noticed in the opinion, except *Legge* v. *Asgill;* and no attempt is made to distinguish that case, although the direction there that any money left unemployed might " be given in charity," as Mr. Boyle remarks in his able and discriminating treatise, " surely must be regarded as pointing quite as much, if not more, to private than to public charity." Boyle on Charities, 300. Sir Thomas Plumer's expression, that " the charities recognized by this court are public in their nature, they are such as the court can see to the execution of," suggests the inference that he thought it necessary to have the funds distributed openly in the public view, or the court could not supervise the distribution. This inference is confirmed by his adding, " Assisting individuals in distress is private charity; but how can such a charity be executed by the court?" To which it may be answered, " By requiring an account, as of any other trustee who is charged with neglect or breach of trust." And the cases already cited show that Lord Hardwicke, Lord Eldon, Sir William Grant and Sir John Leach upheld and executed charities for privately assisting indefinite numbers of individuals in distress. Sir Thomas Plumer says, " In all cases the general principle is, that the trust must be of such a tangible nature as that the court can deal with it; when it is mixed up with general moral duty, it is not the subject of the jurisdiction of a court of justice." But general moral duty, carried out in acts beneficial to an indefinite number or class of persons, is of the very essence of a charity; and in the cases in which trusts have been set aside as too vague, it has been upon the ground that they might be applied to the benefit of particular individuals, to benefit whom was of no general or public advantage. If, as he says, " private charity is in its nature indefinite," it has the principal requisite of a public charity. This judgment of Sir Thomas Plumer, although countenanced by *obiter dicta* of Lord Cottenham near the beginning of his career as chancellor, in *Williams* v. *Kershaw,*

5 Law Journ. (N. S.) (Ch.) 86, and *Ellis* v. *Selby,* 1 Myl. & Cr. 293, cannot, in a court not bound by it as a precedent, outweigh all the other authorities.

There is a species of organization, sometimes called a " private charity," which is not a public or general charity in the view of the St. of Eliz. or of a court of chancery ; and that is an association for the mutual benefit of the contributors and of no other persons. But such a case wants the essential element of indefiniteness in the immediate objects, if not that of gratuity in the contribution. *Anon.* 3 Atk. 277. *Attorney General* v. *Haberdashers' Co.* 1 Myl. & K. 420. *Carne* v. *Long,* 2 De Gex, Fisher & Jones, 75. *Attorney General* v. *Federal Street Meeting-house,* 3 Gray, 44–52. Upon no reasonable construction can a bequest to " private charity," still less one to " charity, public or private," be brought within that class.

The decisions of Lord Langdale, to which the plaintiffs have referred, were as follows : In one of them he held a bequest to executors to receive the interest half-yearly " and divide it among poor pious persons, male or female, old or infirm, as they see fit, not omitting large and sick families, if of good character," to be a valid charitable bequest for the poor. *Nash* v. *Morley,* 5 Beav. 177. In the other, of a bequest to trustees, to be applied at their discretion " for the relief of domestic distress, assisting indigent but deserving individuals, or encouraging undertakings of general utility," Lord Langdale said that if the sentence had ended with the word " individuals," it would have been a good charitable purpose ; but he felt himself bound by the decisions to hold that the words " general utility " (which do not occur in the will before us) were large enough to include purposes which were not charitable, and that the whole bequest was therefore void. *Kendall* v. *Granger,* 5 Beav. 300.

In *Ellis* v. *Selby,* 7 Sim. 352 ; *S. C.* 1 Myl. & Cr. 286, the only point decided was that a bequest in trust for " charitable or other purposes " as the trustee should think fit, was void. The correctness of that decision cannot be doubted ; for the testator could hardly have expressed more clearly an intention to allow the fund to be applied to purposes which were not charitable, as

well as to those which were. The decision of Sir John Leach in *Vezey* v. *Jamson.* 1 Sim. & Stu. 69, against the validity of a gift in trust for " such charitable or public purposes as the laws of the land would admit of, or to any person or persons," and in such shares and manner as the trustees should think fit or as the laws admitted of, is to the same effect; and manifests no intention to overrule or qualify the cases in which he had upheld trusts for " public or private charities " or " to be distributed in charity to private individuals or public institutions," or for " charitable and benevolent purposes." *Johnston* v. *Swann,* and *Horde* v. *Earl of Suffolk, supra. Jemmit* v. *Verril, infra.* The passages quoted from Lord Lyndhurst's opinion in *Mitford* v. *Reynolds,* 1 Phillips R. 190, and from Tudor on Charitable Trusts, (2d ed.) 223, go no farther. Within the same class falls the decision of Vice Chancellor Knight Bruce, that a direction that part of the testator's property should " be given in occasional sums to deserving literary men, or to meet expenses connected with my manuscript works," part of the profits of which works he gave to members of his family, was void. *Thompson* v. *Thompson,* 1 Colly. R. 388, 392, 399. Others of the cases cited for the plaintiffs related to bequests in trust to be disposed of in the trustees' discretion, without any mention whatever of charities in the will. Such were *Fowler* v. *Garlike,* 1 Russ. & Myl. 232; and *Stubbs* v. *Sargon,* 2 Keen, 255; *S. C.* 3 Myl. & Cr. 507.

We are therefore of opinion that, upon principle and authority, a bequest for " objects and purposes of charity, public or private," is a valid charitable gift. The effect of the use of the word " benevolence " in connection with the word " charity " remains to be considered.

The earliest case cited for the plaintiffs upon this point is that in which Sir William Grant, and Lord Eldon on appeal, held that a bequest to the Bishop of Durham in trust to be applied " to such objects of benevolence and liberality as the Bishop of Durham in his own discretion should most approve of," was too indefinite to be executed. *Morice* v. *Bishop of Durham,* 9 Ves. 399; *S. C.* 10 Ves. 521. But " liberality " might include gifts

to persons who were neither poor nor deserving, and in no sense, legal or moral, objects of charity. The word "charity" was not used; and its absence was much relied on, Sir William Grant saying, "The use of the word 'charitable' seems to have been purposely avoided in this will, in order to leave the bishop the most unrestrained discretion." 9 Ves. 404, 405; 10 Ves. 541. Sir William Grant afterwards held that a bequest to trustees "to be by them applied and disposed of for and to such benevolent purposes as they in their integrity and discretion may unanimously agree on," fell within the same class. *James* v. *Allen*, 3 Meriv. 17. But in that case again the word "charity" was not used. Lord Brougham subsequently defined the distinction upon which those cases turned, thus : "If the intention be charity, the court will execute it, however vaguely the donor may have indicated his purpose. But mere purposes of a kind generally beneficial, as of those of benevolence or liberality, without specifying the objects who are to receive, and those objects not being the poor, the court will never attempt to execute." *Attorney General* v. *Haberdashers' Co.* 1 Myl. & K. 428

Vice Chancellor Leach used "general benevolence" as equivalent to charity. He held a bequest "to the widows and orphans of the Parish of Lindfield" to be a charitable gift for the poor widows and orphans of that parish, because it "could not in its nature have proceeded from motives of personal bounty to particular individuals ; it must have proceeded from general benevolence towards two classes of persons who were suffering under a common circumstance of destitution or privation, and is necessarily to be confined to such of those two classes who are within the scope of general benevolence." *Attorney General* v. *Comber*, 2 Sim. & Stu. 93. And he upheld a bequest to trustees, to be applied and disposed of "for such charitable and benevolent purposes" as one of them should direct and think proper. *Jemmit* v. *Verril*, Ambl. 585, *note.*

By far the strongest case in favor of the plaintiffs is that of *Williams* v. *Kershaw*, which is not to be found in any of the regular reports, but is reported by Mr. Beavan in 5 Law Journ. (N. S.) (Ch.) 84, and an abstract of it printed in 5 Clark & Fin. 111

In that case a testator, after legacies for education, the poor, missionary societies and dissenting ministers, gave the residue of his personal estate to trustees to apply the income " to and for such benevolent, charitable and religious purposes as they in their discretion shall think most advantageous and beneficial." Sir Christopher C. Pepys, M. R., considered himself bound by the cases of *Morice* v. *Bishop of Durham*, *James* v. *Allen*, and *Ommanney* v. *Butcher*, to hold that this would authorize the application of the income to benevolent purposes which were neither charitable nor religious, and was therefore void ; and two months afterwards, having meanwhile become Lord Chancellor Cottenham, he referred to the decision with approval. *Ellis* v. *Selby*, 1 Myl. & Cr. 298.

But that decision is directly opposed to the construction given to like words in earlier and later judgments of the house of lords upon appeal from the courts of Scotland. In *Hill* v. *Burns*, 2 Wils. & Shaw, 80, a bequest was held valid, by which a testatrix appointed the residue of her estate " to be applied by my said trustees in aid of the institutions for charitable and benevolent purposes, established or to be established in the city of Glasgow or neighborhood thereof; and that in such way and manner, and in such proportions of the principal or capital, or of the interest or annual proceeds of the sums so to be appropriated, as to my said trustees shall seem proper; declaring, as I hereby expressly provide and declare, that they shall be the judges of the appropriation of the said residue for the purposes aforesaid." That case was cited as authority by Lord Lyndhurst in *Crichton* v. *Grierson*, 3 Bligh N. R. 434; *S. C.* 3 Wils. & Shaw, 341. In a later case, in which *Williams* v *Kershaw* was cited, the house of lords established a residuary bequest to trustees to be applied " to such benevolent and charitable purposes as they think proper," recommending them, if it should amount to £600, to hold the principal, and pay out the income annually ' to faithful domestic servants, settled in Glasgow or the neighborhood, who can produce testimonials of good character and morals from their masters and mistresses after ten years' service;" but if less than that amount,

the testator authorized his trustees " to distribute the same to such charitable or benevolent purposes as they may think proper." *Miller* v. *Rowan*, 5 Clark & Fin. 99; *S. C.* 2 Shaw & Macl. 866.

It was indeed said in the two cases last cited that the law of England as to charitable bequests was more strict than the law of Scotland. But the decisions of the English courts since our Revolution are of no binding authority in this court; and, upon such a question as the interpretation of the word " benevolence," as connected with " charity," of no peculiar weight, when opposed to the well settled meaning of those words in our own law.

The word " benevolent," without the addition of any synonymous or explanatory words, has been often, if not uniformly used in the statutes of the Commonwealth, as equivalent to " charitable." The *St.* of 1790, *c.* 19, incorporating and establishing the Humane Society of the Commonwealth of Massachusetts, had this preamble : " Whereas it is the duty of government at all times to countenance and support its citizens in their exertions for alleviating the distresses of their fellow-men : And whereas divers persons have petitioned this court for an act of incorporation, whereby they may more effectually carry into execution their benevolent designs." " The end and design of the institution of the said society," as declared in the fifth section of that act, " is for the recovery of persons who meet with such accidents as produce in them the appearance of death, and for promoting the cause of humanity, by pursuing such means from time to time as shall have for their object the preservation of human life, and the alleviation of its miseries." 1 Special Laws, 288, 289. The *St.* of 1818, *c.* 77, incorporating the Newburyport Howard Benevolent Society, provided that " the funds of said society shall always be improved and appropriated to the humane purposes of relieving the distresses of the poor, the sick and the aged." The *St.* of 1833, *c.* 123, incorporated the United States Naval Benevolent Association, " for the purpose of affording relief to the widows, orphans, parents or maiden sisters of the members of said association, and such other persons as said

association may from time to time deem entitled to its assist-ance." The *St.* of 1852, *c.* 161, established a corporation by the name of the Georgetown Women's Benevolent Society, "for the purpose of aiding and promoting benevolent enter-prises." See also *Sts.* 1817, *c.* 124 ; 1854, *c.* 223 ; 1857, *c.* 154.

From the early part of this century, at least, the word " be-nevolence," as coupled with " charity," has been constantly used in the legislation of Massachusetts to signify purposes strictly charitable, and especially the relief of the poor. By *St.* 1802, *c.* 69, the Portland Benevolent Society were incorporated to relieve and assist the poor, " and generally to exercise such acts of charity, hospitality and benevolence, as the funds of the society shall allow." 3 Special Laws, 85. By *St.* 1808, *c.* 58, the Beverly Charitable Society were incorporated for the pur-pose of raising a fund in order to relieve and assist the poor inhabitants of Beverly, widows and orphans, " and generally to perform such acts of charity and benevolence, as the funds of the society may allow ; " and were authorized to take and hold property, " to be used and improved for the purposes aforesaid, or such other benevolent purposes as the donor may particularly direct." By *St.* 1816, *c.* 22, incorporating the Franklin Charita-ble Society, " the funds of the said society shall be always im-proved and appropriated to benevolent and humane purposes." By *St.* 1819, *c.* 52, incorporating the Trustees of the Ancient Landmark Charity Fund, they were to employ the income of their estate " in acts of charity and benevolence, and not other-wise." By *St.* 1819, *c.* 102, incorporating the Trustees of Saint Peter's Charity Fund in Newburyport, they were vested with the powers and privileges, and made subject to the duties and lia-bilities, " incident to other charitable institutions ; " and might employ their income " in acts of charity and benevolence, and for no other use whatever ; " and make rules and by-laws " for the better management and administering the said charity." By *St.* 1831, *c.* 18, the Massachusetts Charitable Fire Society were authorized to appropriate part of their funds " to any other char-itable purpose or purposes than those mentioned in their act of incorporation, and to such benevolent institutions within this

Commonwealth," as the society might designate. By *St.* 1832 *c.* 67, the Marblehead Charitable Society were incorporated, "for the purpose of raising a fund in order to assist and relieve each other when in circumstances of want and distress, to aid their destitute widows, to provide for their helpless orphans, and to perform such acts of charity and benevolence as the funds of the society may allow." By *St.* 1838, *c.* 142, incorporating the Truro Benevolent Society, their property was "to be devoted exclusively to charitable purposes;" and by *St.* 1840, *c.* 56, the Wellfleet Marine Benevolent Society were incorporated, and authorized to hold property "for charitable purposes." By *St.* 1843, *c.* 35, the Lowell Irish Benevolent Society, and by *St.* 1845, *c.* 168, the Marblehead Female Humane Society, were incorporated "for charitable and benevolent purposes;" and similar language is used in the charters of many other "benevolent" or "charitable" societies. *Sts.* 1854, *c.* 404; 1856, *cc.* 140, 212, 221, 281, 303.

The general tax law of the Commonwealth, in enumerating the classes of property exempted from taxation, inserts, between the property of the United States and of the Commonwealth, and the property of common school districts the income of which is appropriated to the purposes of education, "the personal property of literary, benevolent, charitable and scientific institutions incorporated within this Commonwealth; and the real estate belonging to such institutions, occupied by them or their officers for the purposes for which they were incorporated." Gen. Sts. *c.* 11, § 5, *cl.* 3. This clause in its present shape was inserted by the legislature thirty years ago in the Rev. Sts. *c.* 7, § 5, *cl.* 2.

Whatever therefore may be the meaning, in the law of Massachusetts, of the word "benevolence" by itself, there can be no doubt that when used in connection with "charity," as in this will, it is synonymous with it; and the connecting "or" must be taken in the sense of defining and limiting the nature of the charity intended, and of explaining one word by the other. *Copulatio verborum indicat quod accipiantur in eodem sensu.*

Saltonstall & others *v.* Sanders & others.

In the present case, this construction is fortified by the collocation of the clause in question. The other classes of uses, preceding and following this, are admitted to be charitable in the legal sense which of itself creates a presumption that the purposes of this clause are of the same description. But the fact that in those other clauses are specified religious, moral and educational purposes, which are the principal kinds of charities other than relief of the poor, strongly tends to show that " charity " is not here to be interpreted in its largest technical sense, but that the words " benevolence or charity " were used by the testator in their limited and ordinary popular acceptation. This inference is aided by his use of the word " temperance " in a like sense. And the additional words " public or private " must be taken in their natural meaning, and according to the construction given to them by the courts in a great majority of similar cases, to indicate the mode of distribution only. The manifest intent of the clause is the general relief of the poor, either through public institutions, or through almsgiving by the agency of individuals. The gift, being for a lawful charity, is sufficiently defined to be upheld and enforced by the court.

The testator, in authorizing the trustees to expend at their discretion, for the charitable purposes specified, any part or the whole of either the capital or the income of the trust fund, evidently expected the income at least to be ordinarily paid to such purposes, and cannot be supposed to have contemplated an indefinite accumulation. The possibility of accumulation of the income does not defeat or impair the charitable gift. *Odell* v. *Odell*, 10 Allen, 1, and cases cited.

If at any time hereafter doubts should arise as to the mode of distribution, or the trustees should exercise their discretion illegally or unreasonably, this court, upon bill or information, may control and regulate the administration of the charity.

*Demurrer sustained; bill dismissed.*