AVanamaker, J.;
Hayden, J., and Washburn, J. (sitting as associates by consent of parties), concur.
This action is founded upon a cashier’s bond, which reads as follows:
“Bond.
“Know all Men by These Presents, That we, E. F. Kaneen as principal, and Thomas B. Kaneen, J R. Rogers, J. H. Hills and C. Kranz js sureties, are held and jointly bound to the directors of the Citizens Savings Bank Company of Lorain, 0., in the sum of twenty thousand dollars ($20,000) to be paid to said directors, to which payment we bind ourselves. Signed and sealed this 5th day of November, 1902.
‘ ‘ The conditions of this bond and obligation are that,
“Whereas, E. F. Kaneen has been chosen and appointed cashier of the Citizens Savings Bank Co. of Lorain, Ohio,
“Now, If the said E. F. Kaneen shall faithfully discharge the duties as such cashier and shall faithfully apply and account for all sums of money and such other property of said bank, that may come into his hands as such cashier, and pay over and deliver the same to the order of said directors, or to any other person or persons authorized to receive the same, then this obligation shall be void, otherwise to remain in full force and virtue in laiv.
“E. F. Kaneen (Seal).
“Thomas B. Kaneen (Seal).
“Conrad Kranz (Seal).
“J. R. Rogers (Seal).
“J. H. Hills (Seal).”
*616 The following facts appear, either from the pleadings, the admissions of the parties during the progress of the trial, or the finding of the court from the evidence in the case:
That the principal maker of the bond, E. F. Kaneen, was chosen and appointed, by the finance committee, cashier of the Citizens Savings Bank Company of Lorain, Ohio, September 20th, 1902, and he at once duly entered upon his duties as cashier of said bank, and on November 5th, 1902, the aforesaid bond was duly executed and delivered to said bank. ITe continued to act as said cashier without any change in his relations to said bank until the next annual meeting of the board of directors, held on January 8, 1903, when the following action was taken by said board of directors, as shown by the minutes of their meeting: “E. F. Kaneen was duly elected cashier for 1903 by acclamation after rules had been suspended.”
Kaneen gave no new bond after this election, but continued to serve as cashier without any change in his relations to said bank until the next regular annual meeting of the board of directors, held in January, 1904, at which time the minute book shows the following:
“Moved, seconded and carried that E. F. Kaneen be elected secretary and treasurer for ensuing year at same salary.”
Kaneen, after this election, gave a new bond, secured by a surety company, and continued to serve as secretary and treasurer, or as cashier (the term being used interchangeably by the bank) until the next annual meeting of the board of directors, held in January, 1905, when the minute book again shows that Kaneen was elected cashier for the year 1905. Kaneen thereafter gave a new bond for said year.
On March 30, 1905, the officers of the bank learned that Kaneen had been using the funds of the bank in speculations for his .own benefit, and confronted him with the charge, which Kaneen admitted, stating that he was a defaulter of the funds and property of the bank to the extent of about $97,000. On s&id 30th day of March, 1905, at the suggestion of the bank officials, Kaneen turned over to a trustee for the benefit of the bank securities and property, from which the bank realized the *617 sum of $8,897, and the bank then, on the same day, made an assignment to the plaintiff for the benefit of its creditors.
Out of the pleadings, the foregoing facts, the claims of counsel made in their briefs and during the progress of the trial, there arises the following legal propositions:
Proposition 1. Was the original appointment of Kaneen, as cashier of the bank, a valid and legal appointment?
Proposition 2. Is the plaintiff the real party in interest; or, in short, was this a bond running to the bank ?
Proposition 3. If it was a bond to the bank, and the original appointment was valid and legal, what was the life of the bond ?
Proposition 4. What is the amount of defalcation during the life of the bond ?
Proposition 5. What credits, if any, in money or other property, as shown by the evidence, should be applied to' reduce the amount of defalcations and the resulting amount due on the bond?
Proposition 1. Was the original appointment of Kaneen, as cashier of the bank, a valid and legal appointment?
Mr. C. C. Beckwith had been acting as cashier of this bank for several years, but suddenly resigned on September 20, 1902. Under that date the following entry appears upon the minute book of the bank :
“September 20th, meeting finance committee. Mr. C. C. Beck-with having tendered resignation to take effect at once, Mr. E. F. Kaneen was appointed cashier, subject to approval by board at semi-annual meeting. Adjourned.1 ’
His appointment as such cashier is further supplemented by oral testimony, and confirmed by his acting under such appointment, and the giving of his bond pursuant to such appointment, under date of November 5, 1902.
The court finds that tinder the regulations and by-laws of the bank, and the evidence in this case, that such appointment was valid and legal.
But if any question could arise in reference to the same, the bondsmen are not in a position to now deny the legality of such appointment. They are effectually estopped by the recitals of *618 the bond. The language of the bond in this respect is as follows: “The conditions of this bond and obligation are that, whereas E. F. Kaneen has been chosen and appointed cashier of the Citizens Savings Bank Co. of Lorain,' Ohio.”
The authorities to sustain this proposition are abundant. A few of them are as follows: Kelly et al v. The State, etc., 25 O. S., 567; Stearns on Suretyship, Section 152; Brandt on Suretyship and Guaranty, 2d Ed., Section 642: Phenix Ins. Co. v. Findlay, 59 Iowa, 591; Lionberger v. Kreiger, 88 Mo., 160.
Proposition 2. Is the plaintiff the real party in interest; or, in short, was this a bond running to the bank ?
The object and purpose of the bond is manifest from the terms and conditions of the bond itself, to-wit, the safekeeping of the funds and property of the bank. It was given for the benefit of the bank. It was given to the directors, not designating them as individuals, but as the “directors of the Citizens Savings Bank Company.” It provided for the faithful discharge of Kaneen’s duties as such cashier, and that he would faithfully apply and account for all sums of money and such other property of said bank that may come into his hands as such cashier arid pay over and deliver the same to the order of said directors.
Under the terms of the bond, the relation and understanding of all the parties thereto as shown by the evidence, the bank was the real and sole party in interest, and had a right to sue on the bond; and Fancher, as its assignee, has succeeded to the same right. R. S., 4493, 4494; Keith v. Perry Coal Co., 10 S. W. Rep., 32; Thompson v. The Marion & Monroe Gravel Road Company, 98 Ind., 449.
Proposition 3. What was the life of the bond?
This is the most vital question in the ease; and the court desires at this time to acknowledge its obligations to counsel for the thorough and painstaking research they have made in order to throw light and authority upon this proposition.
Apparently the numerous cases cited from the supreme courts of sundary states, and also many federal decisions, are seriously *619 in conflict, while in Ohio this question, so far as it relates to cases of this kind, is wholly unadjudicated.
A careful examination of the authorities cited shows that the conflict of decisions is more apparent than real. At bed rock they stand upon the same legal and equitable principles.
A bond is simply a contract of suretyship by and between the parties thereto, and the same rules must apply in construing the terms and conditions of that contract that apply generally, save and except that in cases of suretyship the letter of the contract should be more strictly construed. If the contract itself fixes its term of life, and such term is not countervailed by any controlling constitutional or statutory provision, then the term of the contract must prevail.
In this case, however, the contract of suretyship is silent as to the term for which the obligors have bound themselves, and it then becomes the duty of the court to put itself in the place of the contracting parties and to consider all the facts and eir’cumstances surrounding them at the time of the execution of the instrument.
What was the situation of the parties on November 5, 1902, when the bond in question was given ?
On September 20, 1902, C. C. Beckwith, who had been cashier of this bank for several years, suddenly resigned, his resignation to take effect at once. On the same day the finance committee of the bank chose and appointed E. F. Kaneen as cashier to fill the vacancy caused by Beckwith’s resignation. Kaneen at once entered upon his duties as cashier. Kaneen proceeded to furnish a bond, which was finally executed and delivered to the bank or its officers on November 5, 1902. Kaneen continued to serve by virtue of this appointment until January 8, 1903, when the records of the bank show that the following action was taken,: “E. F. Kaneen was duly elected cashier for 1903 by acclamation after rules had been suspended.”
The parties to the appointment of Kaneen on September 20, 1902, as well as the parties to the bond on November 5, 1902, contracted not only with reference to the facts and circumstances surrounding them and the situation caused by the vacancy grow *620 ing out of Beckwith’s sudden resignation, but also with reference to the law in force under and by virtue of R. S. 3247, et. seq., and the by-laws of the bank pursuant thereto. The latter read as follows:
“The annual meeting of the stockholders for the election of directors shall be held at the office of the company on the second Thursday of January of each year, at the hour of 10 a. m:., and special meetings may be held at such times and places as may be ordered by the board of directors.
“The officers of the company shall consist of a president, a vice-president and a secretary and treasurer, to be also designated and called cashier, and also an assistant cashier, to be elected by the board of directors, who shall hold their office for one year, and until their siiccessors are elected and qualified, unless sooner removed by a majority of said board. ”
The finance committee must have understood their limited powers in making the appointment to fill the vacancy, else why should they have added “subject to the approval by board at semi-annual meeting.” The board of directors understood that this was only a temporary appointment, else why should they proceed, on January 8th, 1903, to elect “E. F. Kaneen cashier for 1903.” •
The minutes of the bank show remarkable uniformity in holding annual elections at their January meeting of each year from the time of the organization of the bank until it closed its doors by reason of Kaneen’s defalcations and its resulting insolvency and assignment to Fancher; that a president was annually elected, a vice-president was annually elected, and a cashier, sometimes designated as secretary and treasurer, was also annually elected. This unvarying custom and usage upon the part of the bank fixes the office of cashier as an annual office.
But, it is contended, that by reason of the fact that Kaneen, after election, January, 1903, failed to give any other or further bond; that he never qualified under such election, and, therefore, could not hold the office of cashier under such election, and that. by reason of the by-law of the corporation he held over under the former appointment and bond until January, 1904, when the next .annual election took place and. Kaneen gave a new bond. Said *621 by-law reads as follows: “Who shall hold their office (incliiding the cashier) for one year and until their successors are elected and qualified, unless sooner removed by a majority of the said board.”
The court is cited to the case of State, ex rel, v. Berg, 50 Ind., 496, in support of the “hold-over” doctrine. In that case, however, there was an express provision in the Constitution of .Indiana as follows:
‘£ That any officer other than a member of the General Assembly shall hold his office for any given term, and the-same shall be construed to mean that such officer shall hold his office for such term and until his successor shall have been elected and qualified. ’ ’
An act of the Legislature, supplementing that constitutional provision, provided that a trustee shall hold his office for one year and until his successor is elected or qualified.
The. case is decided solely upon the Indiana Constitution, statute law and previous adjudications by Indiana courts, and no other case of any other court is in any wise reviewed in the report of the .Berg case.
In Thompson v. State, 37 Miss., 518, the same doctrine is laid down by virtue of a similar statute; and in the Mississippi case as well as the Indiana case, the matter relates to public officers.
As to public officers, where the “hold-over” doctrine prevails, the courts have placed it upon the ground of public policy in order to protect'the public against the laches and negligence of its own officers; and yet this rule as to public officers has been repudiated in Ohio.
Our own Supreme Court has held, in State v. Crooks, 7 Ohio, pt. 2, 221:
“When a sheriff in office is re-elected and proceeds to do business without giving a new security, the securities upon the first election are not responsible for defaults committed under the second.
“In case of officers of private corporations the overwhelming weight of authority holds that the rule is that the laches and negligence of the officers of the corporation in failing to require of their fellow officers good and sufficient bonds upon their annual or upon their several elections, shall not work an extension of what would otherwise be a fixed and definite term.”
*622 In Welsh v. Seymour, 28 Conn., 387, Judge Ellsworth uses the following language:
“Directors are to be chosen annually. They are to choose the president and vice-president from their number, and the secretary and treasurer at large. If this were all, no one could doubt that all these appointments were intended and required to be annually by a fair and just construction of the articles of association. So the company themselves have understood them, and have uniformly made the appointments annually in accordance with that understanding [as in the case at bar]. But it is said that the words ‘until others are elected in their stead’ ought to be construed as admitting of an indefinite continuance in office. These words, whatever be their effect, are equally applicable to all the officers named in the paragraph — president, vice-president, directors, secretary and treasurer. Now, can it be possible that all these officers are to be regarded as continuous ones ? Can it be said that such is the fair meaning of the article, and that it does not contemplate annual appointments or elections ? But if this construction were allowed it would be of no avail in this instance, because the company have from the first made annual elections. No such construction is, however, allowable. ”
In the same case the court uses this language:
“A provision for an extension of an official term until a successor is appointed is well understood and intended to be a precaution against the vacancy or lapse in the office, not to create an unlimited tenure; and a second appointment is a revocation of the first and puts an end to it.” Citing Commissioners v. Greemoood, 1 Dessau, 452; and United States v. Kirkpatrick, 9 Wheat., 720.
In Chelmsford. Co. v. Demarest, 7 Gray, 1, Chief Justice Shaw, delivering the opinion of the court, says:
‘. ‘ The law having directed that such' officers shall be chosen annually, or at the annual meeting, it assumes and pre-supposes that such direction will be complied with, and then the words in question must be construed to mean until the new incumbent can be conveniently qualified, and in a manner compatible with existing engagements. ’ ’
This same “hold-over” doctrine is considered in the ease of Board of County Commissioners, etc., v. Ring et al (Minnesota) , 13 N. W., 181 :
*623 “Statutes like that referred to, fixing a definite period as the term of an office with an alternative clause added providing for an extension of the incumbents until their successors shall be elected and qualified, have been considered as establishing as the proper term of office the period specifically named. The provisions for a contingent holding over that time is a precautionary one t'o prevent a possible vacancy or lapse in the office, and it is not intended to create an unlimited term or to indefinitely extend the prescribed term.”
The following cases are therein cited: Mayor, etc., of Rahway v. Crowell, 40 N. J., 207; Mayor of Wilmington v. Horn, 2 How., 190; Dover v. Towmbly, 42 N. H., 59; State Treasurer v. Mann, 34 Vt., 371; County of Wapello v. Bingham, 10 Iowa, 39; Bigelow v. Bridge, 8 Mass., 275; Chelmsford Co. v. Demorest, 7 Gray, 1; Mutual Loan & Building Assn. v. Price, 16 Fla., 204; Harris v. Babbitt, 4 Dill., 185.
Many other eases might be reviewed with interest and profit, but time forbids mentioning more than two that are specially relied upon by counsel for the plaintiff to sustain the “holdover” doctrine. Amherst Bank v. Root, 2 Met., 522 (Mass.); Westervelt v. Mohrenstecker, 34 L. R. A., 477.
In the Massaehussets case, while the custom of the bank as shown by the records provided for an annual election of the cashier, and that he was regularly so elected for several years, after which he continued to serve for several years without reappointment, that, however, was controlled by statutory enactment, which specially provided that a cashier should retain his place until removed or until another was appointed in his stead, and controlling force was there given to the Massaehussets statute.
In Richardson’s School Fund v. Deen, 130 Mass., 242, a much later case, the Supreme Court of Massaehussettts review the former case and hold that where the statute left with the corporation the right to fix the term of office as it saw fit, and the corporation had for a long series of terms elected its treasurer tri-ennially, it was held that as there was no statute which makes the office a continuous one, the reasoning in the Amherst Bank case was not applicable, and that the corporation had by its long and uniform *624 practice made the office a tri-ennial one, so that when the parties made their contract of suretyship it was with reference to a fixed and limited term.
In the Westervelt case (a federal casé), decided by Judge Sanborn, the National Banking Act was given controlling force, which placed no limit upon the term of office save that they should be elected or appointed under the act of Congress for an “unlimited term” — to a term that could be ended by the bank only by his dismissal by its board of directors.
“That board never did'dismiss him. It never did appoint another to take his place. How subsequent resolutions of appointment could affect the term of his office, which was fixed by this act of Congress, it is difficult to understand. It seems clear his appointment to an office which he already held and would continue to hold without further appointments, could not be more than a manifestation of an intention on the part of the board of directors that he should continue to hold his position. ’ ’
In addition -to the act of Congress fixing an unlimited term, the language of the bond is peculiar in that case: “Now if the said George A. Mohrensteeker for and during all the time he shall hold the said office of cashier of the said bank,’’ etc. Anri the general terms of the bond, together with the unlimited term fixed by the act of Congress were the decisive factors in that opinion. Judge Sanborn himself in the same case lays down the general doctrine:
“It is familiar law that in cases where the term of office to which the principal is elected or appointed is fixed by law, the liability of his bondsmen will be limited to the current term, unless they expressly agree to continue liable after its expiration.”
Numerous authorities are cited in the opinion to sustain this general doctrine.
After all, the bond being silent as to the term of its life, and being predicated directly upon the appointment of the cashier, the question is: What, under all the evidence, custom, usage, must have been the understanding and contemplation of the. parties, other than the fact that the bond was intended to cove]’ *625 the temporary period for which Kaneen was first appointed? The finance committee had no authority to provide for other than the temporary vacancy under the by-laws of the bank. The board of directors so recognized it when they, in accordance with their unvarying custom, proceeded at their next annual election to elect a cashier; and their laches and negligence in failing to provide for a new bond predicated upon his first election is the misfortune and default of the bank, and can not be charged against the bondsmen in this case.
Proposition 4. What is the amount of defalcations during the life of the bond?
The plaintiff claims a total defalcation between November 5, 1902, and January 8, 1903, of $10,300. The defendants admit all of these defalcations claimed by the plaintiff during the period above mentioned, except $950 thereof, the difference arising by virtue of defendants’ claim that some of the collateral pledged to secure the $2,300 loan by Kaneen was subsequently returned to him, and by him replaced in the files of the bank."
It being conceded by the defendants that the collateral was embezzled during said term of the bond, the burden is upon them to show that any part of said collateral was returned to the bank. The court finds that the evidence in the case does not sustain this contention, and, therefore, finds that the total amount of defalcations during the life of the bond was $10,300.
. Proposition 5. What credits, if any, in money or other property, as shown by the evidence, should be applied to reduce the amount of defalcations and the resulting amount due on the bond?
First, what credits, under the evidence, are the defendants entitled to ? So far as the- return of any of the moneys embezzled by Kaneen are concerned, the court does not find under the evidence in this case that any bona fide, genuine re-payments were ever made to the bank. The bogus fictitious entries of Kaneen on the books of the bank are wholly unreliable and untrustworthy. But, if there is any question about the matter, Kaneen’s own *626 deposition settles the controversy; for he himself, under the pressure of cross-examination, admits that none of the numerous sums embezzled by him were ever returned to the bank, either in kind or equivalent.
It is admitted, however, that property of the value of $8,897 was turned over to Isaac Iioneeker, president of the bank, as trustee, to secure Kaneen’s indebtedness to the bank by reason of his defalcations. Defendants claim that that should be applied to the oldest items of embezzlement, and the oldest items being including in the $10,300 that that should be reduced by the amount of $8,897.
When that $8,897 was turned over to the trustee for the payment of this indebtedness, Kaneen had the right to direct that it should be applied in satisfaction of his defalcations during the term of the bond in question. He, however, did not exercise the right. In failing to exercise such right to apply the payment as aforesaid, the bank doubtless had the right to apply the money.
Under the evidence in this case it appears that neither the creditor nor the debtor made the application, unless it might be claimed that the conversion of the property into money and turning the same into the funds of the bank and applying the same to the payments of dividends to the creditors would be such application as is contemplated by law. This, however, is rather a suggestion of counsel than a showing made by the evidence, and the court finds that the parties having failed to make such application as the law contemplates, it then becomes the duty of the court to make the application.
The rule of the civil law, under such circumstances as in this ease, was to apply the payment to that debt, a relief from which will be most beneficial to the debtor. That, however-,‘is not the rule at common law. Where the common law prevails, two rules have been found by experience to lead to equitable results. One is, "that where there are items of debit and credit in a running account, in the absence of specific appropriation, the credits will ordinarily be applied to the' discharge of the items antecedently due in the- order of the account. ’ ’
*627 The other rule is, ‘ ‘ that where a general payment is made without application by either party, and there are divers claims, some of which are but imperfectly and partially secured, the court will apply it to those debts for which the security is most precarious. ’ ’
If these rules conflict, as between the debtor and creditor only, the rule applying payments to the most' precarious debts will ordinarily prevail over the rule applying the payments to the oldest demands.
Chief Justice Marshall, in an early ease, 6 Cranch, 8, laid down the following doctrine:
“It is contended by the plaintiffs that if the payments have been applied by neither the debtor nor the creditor, they ought to be applied in the manner most advantageous to the debtor, because it must be presumed that such was his intention. The correctness of this conclusion can not be conceded. When a debtor fails to avail himself of the power which he possesses in consequence of which that power devolves on the creditor, it does not appear unreasonable to suppose that he is content with .the manner in which the creditor will exercise it. If neither party avails himself of his power, in consequence of which it devolves upon the court, it would seem reasonable that an equitable application should be made. It being equitable that the whole debt should be paid, it can not be inequitable to extinguish first those debts for which the securities are most precarious. ’ ’
Do Kaneen’s defalcations constitute a running account of items of debit and credit between him and the bank? The bank knew nothing of Kaneen’s defalcations, kept no account with him in reference thereto. No such account was kept by Kaneen himself upon°the books of the bank. Tt is true he made blind, blank entries upon the books of the bank, many of which were false and fictitious, none of which have been proven to have been genuine and to have evidenced bona fide transactions. And Kaneen having testified himself that he repaid none of the. money that he embezzled from time to time, certainly a mere statement of the numerous items of embezzlement without any credits upon them whatsoever and wholly unknown to the bank until after the defalcations had ended, do not constitute what is known *628 as a running account where credits would be applied to the oldest items. And the foundation of the rule even in such case lies in the equitable principle of first paying off the oldest debt, because the oldest debt is the most precarious; it is the first to be outlawed. The court has been cited to no case where the rule governing the application of payments on running accounts has been applied to such a case as the one at bar.
In the Seidensteeker case, 102 N. W., 821, where payments were applied by the court to the oldest demands and the surety thereby relieved, there was “an itemized statement of the account of moneys alleged to have been converted” by the cashier, and the cashier seems rather to have borrowed than stolen the money. The opinion recites:
‘ ‘ There seems to have been little or' no concealment of the fact that he was 'using moneys drawn from the bank, the items being from time to time charged to him on the books of the bank and the amount credited with occasional payments or deposits and by notes given in settlement of his overdrafts.”
A Pennsylvania case (5 Atlantic, 36), cited in support of the doctrine of applying credits to the oldest items, does not seem to have reasoned the rule, but to have merely assumed it.
Kaneen’s transaction with the bank did not constitute a running account, and said rule does not apply in this case. But the rule laid down in 11 O. S., 506, and which is cited with approval in 39 O. S., 635, and 74 O. S., 307, would seem to be the equitable rule to apply in this case.
The evidence shows that from January 8, 1903, to January 9. 1904, the defalcations aggregated $35,000 and over, for which the bank holds no security whatsoever. It is all a total loss to the bank, unless the amount realized from Kaneen’s property, to-wit, $8,897, be applied to those defalcations. The court believes, at all events, that none of said sum should be applied to reduce the $10,300, being the aggregate of Kaneen’s defalcations during the life of the bond.
The. court, therefore, finds the issues in this case with the plaintiff, and assesses the amount due the plaintiff from the defendants, E. F. Kaneen and Conrad Kranz, being the only surety *629 served with process in this case, in the sum of $10,300, with interest at six per cent, from the date of demand, April 24, 1905, to the first day of this term of court.
Motion for new trial may be filed, and will be overruled, and judgment entered in accordance with the above finding.